**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ALCRESTA THERAPEUTICS, INC., ) | |
| 15 Independence Rd., 4th Floor ) | |
| Warren, NJ 07059, ) | Case No. _____ |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| ALEX AZAR, ) | |
| Secretary of Health and Human Services ) | |
| 200 Independence Avenue, S.W. ) | |
| Washington, DC 20201, ) | |
| ) | |
| Defendant. ) | |
| ) | |

## I.      NATURE OF ACTION

1.      This is an action under the Administrative Procedure Act for judicial review and declaratory and injunctive relief from an arbitrary and factually unsupported final agency determination.  The determination merely rubber-stamped an illegitimately functioning agency workgroup's decision to deny an appropriate, industry-wide billing code for a unique medical device known as "RELiZORB."

2.      RELiZORB is a digestive enzyme packed device that enhances enteral feeding for a small population of medically fragile persons who are not adequately served by any other product currently available.  It is prescribed for the sickest and most vulnerable of patients with cystic fibrosis, pancreatitis, pancreatic cancer, or other serious diseases who suffer from fat malabsorption and are, as a result, severely malnourished, underweight, and suffer from significant gastrointestinal symptoms.  These patients rely on RELiZORB to help the digestive process by breaking down fats in enteral tube feeding formula into an absorbable form.  This enables the patients to absorb more calories and the essential fatty acids that are critical for

growth and development, as well as reduce gastrointestinal symptoms associated with fat malabsorption.  Thus, as an innovation that helps a sub-set of sick and vulnerable patients, RELiZORB answers the call on the front page of the agency website to "help to find the way forward to a better health care system for all Americans."  Center for Medicare and Medicaid Services website, https://www.cms.gov/ (last visited Feb. 1, 2018).

3.     Because RELiZORB is a novel, one-of-a-kind device cleared through the FDA's *de novo* process that does not fit into any existing medical billing code, Alcresta applied for a separate medical billing code for the device under the system of standardized, national codes mandated by Congress under the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), 42 U.S.C. § 1320d-2.

4.     As demonstrated to the agency and its workgroup, RELiZORB meets all of the criteria for a unique code.  It is an FDA-cleared medical device that provides the therapeutic benefit of mimicking normal pancreatic function by hydrolyzing fats.  No other cleared product on the market provides the same benefits to cystic fibrosis and other patients suffering from severe fat malabsorption.  There is a national program operating need among insurers for RELiZORB to be separately identified.  And patient usage exceeds the required volume and marketing criteria.

5.     In contrast, the record shows that the criteria for use of an existing code are not satisfied.  No product on the market functions similarly to RELiZORB.  Yet the agency's workgroup refused to issue a unique billing code and inexplicably found that RELiZORB is adequately described by an existing code.

6.     The denial seems to reflect an invalid assumption that the separate RELiZORB device is part of the standard tubing equipment that all enterally fed patients need and indeed

receive.  In actuality, RELiZORB is an additional, prescribed enzymatic product from which only the most severely malnourished of these patients derive benefit.  The device is connected to the basic tubing through which enteral feeding formula flows, but is not part of it.

7.      On its face, the denial of Alcresta's application for a unique code does not reflect reasoned decision-making.  The decision contains no rationale from which to understand the decision, but simply incorporates an illegitimate workgroup decision that conflicts both with the established rules for assigning billing codes and the evidence in the record before the agency.  The denial of Alcresta's application for a unique medical billing code for RELiZORB thus should be set aside because it is both arbitrary and capricious and not supported by substantial evidence.

8.      The denial is also invalid because it is based on criteria for new billing codes that amount to substantive rules yet were not adopted through notice and comment rulemaking.  In addition, the agency's delegation of decision-making authority to the workgroup is contrary to the requirements of the Federal Advisory Committee Act ("FACA"), 5 U.S.C. app. 2 §§ 9-10, and otherwise unlawful.  This kind of decision-making operates as a disincentive to Alcresta and other small companies to develop innovative products that, like RELiZORB, serve small populations of vulnerable patients.  The option of reapplying again and again through this same defective, behind-closed-doors process is not sustainable for Alcresta.  And most importantly, the continued lack of a unique code for RELiZORB makes it hard or impossible for severely ill and malnourished patients to get a product that the evidence shows would improve their health and lives.

9.      For all of these reasons, the decision to deny Alcresta's request for a unique billing code should be declared unlawful and set aside.  The agency should be required to make a

considered determination on Alcresta's application independent of the workgroup's decision and, consistent with the factual record and valid applicable criteria for making coding determinations, a determination that could only reasonably yield a unique code for RELiZORB.

## II.    JURISDICTION AND VENUE

10.    Jurisdiction is proper under 28 U.S.C. § 1331.

11.    This action arises under the Health Insurance Portability and Accountability Act of 1996, 42 U.S.C. § 1320d-2, the Federal Advisory Committee Act, 5 U.S.C. app. 2 §§ 9-10, and the Administrative Procedure Act, 5 U.S.C. §§ 701-706.

12.    Venue is proper in this judicial district under 28 U.S.C. § 1391(e).

## III.    THE PARTIES

13.    Plaintiff Alcresta Therapeutics, Inc. ("Alcresta") is a small company focused on developing and commercializing innovative enzyme-based products designed to address nutritional challenges faced by medically fragile persons living with gastrointestinal disorders and rare diseases.  Alcresta developed and manufactures RELiZORB.

14.    Defendant Alex Azar is the Secretary of Health and Human Services.

15.    The Department of Health and Human Services ("HHS") houses the Centers for Medicare & Medicaid Services ("CMS"), to which HHS has delegated authority to establish medical billing codes.  References in this Complaint to CMS are meant to refer to that component of HHS.  CMS established the Healthcare Common Procedure Coding System ("HCPCS") Workgroup on billing codes.  HHS also houses the Food and Drug Administration ("FDA").  Among the FDA's responsibilities is clearance of prescription medical devices.

## IV.    STATUTORY AND REGULATORY BACKGROUND

### A.  HIPAA and the Mandate for National, Uniform Code Sets

16.     Congress required HHS to establish a nationwide, standard coding system to facilitate the electronic transmission of certain health information under Title II, subtitle F of HIPAA, 42 U.S.C. § 1320d-2.  HIPAA's standardized coding mandate arose from Congress' concern that the lack of uniformity in the then-existing coding system made healthcare billing unduly difficult.  *See, e.g.*, 142 Cong. Rec. S9501-01, S9505 (1996), 1996 WL 438342 ("[T]his legislation improves the Medicare and Medicaid programs and the private health care system through uniform standards that will cut out much of the redtape in health care.").  HHS also recognized the difficulty of dealing with an unwieldy unstandardized coding system, and touted the benefits of uniformity, including cost savings and improved patient care due to the ability for increased coordination.  65 Fed. Reg. 50,312, 50,322-23 (Aug. 17, 2000).

17.     HHS delegated authority to CMS to establish the standard code sets required under HIPAA.  42 C.F.R. § 414.40(a).  And on August 17, 2000, pursuant to HIPAA's standardization mandate, CMS published regulations, now codified at 45 C.F.R. § 162.1002 (2000), that created the standardized coding system at issue known as HCPCS Level II codes. *Id.*; *see also* 65 Fed. Reg. at 50,322-25.

18.     The Healthcare Common Procedure Coding System is comprised of codes for substances, equipment, supplies and other items used in health care services, other than drugs and biologics, except as otherwise specified by regulation.  45 C.F.R. § 162.1002(b)(3).  Health care providers, suppliers and patients use these standard codes in submitting claims to all health care payors, including private insurers and Medicare and Medicaid.  *See* CMS, Healthcare Common Procedure Coding System (HCPCS) Level II Coding Procedures at 1 (Nov. 13, 2015)

(hereinafter "2015 Coding Guidelines"),

https://www.cms.gov/Medicare/Coding/MedHCPCSGenInfo/Downloads/HCPCSLevelIICoding
Procedures7-2011.pdf (last visited Feb. 1, 2018).

19.     The HCPCS is divided into two principal subsystems, known as Level I and Level

II.  *Id.*  This action concerns a final decision with regard to the HCPCS Level II system.

20.      Level I codes are used primarily for medical services and procedures furnished

by physicians and other health care professionals.  *Id.*

21.     "Level II of the HCPCS is a standardized coding system that is used primarily to

identify products, supplies, and services not included in [the Level I system], such as ambulance

services and durable medical equipment, prosthetics, orthotics, and supplies (DMEPOS) when

used outside a physician's office."  *Id.*  The Level II HCPCS "classifies similar products that are

medical in nature into categories for the purpose of efficient claims processing."  *Id.* at 2.

**B.     Code Application Process and the Workgroup**

22.     On December 21, 2000, Congress enacted the Medicare, Medicaid, and SCHIP

Benefits Improvement and Protection Act of 2000 ("BIPA"), Pub. L. 106-554, App. F, 114 Stat.

2763A-463, *reprinted in* 42 U.S.C. § 1395l app.  Pertinent here, through BIPA, Congress

directed HHS to establish procedures that provide for public consultation for the coding and

payment determinations for new durable medical equipment ("DME").  *See id.* § 531(b), 114

Stat. at 2763A-547.

23.     DME is medical equipment that can withstand repeated use, is primarily used to

serve a medical purpose, is generally not useful to an individual in the absence of an illness or

injury, and is appropriate for use in the home.  42 C.F.R. § 414.202.  Nonetheless, by regulation,

CMS has categorized enteral nutrition devices like RELiZORB as prosthetic devices that are

therefore categorized as DME.  *See* 42 C.F.R. § 421.210(b)(2).  The RELiZORB enzyme-packed device itself is intended only for single use and is not durable in the sense of the same unit being reusable, Alcresta 2018 Alpha-Numeric HCPCS Coding Recommendation (Jan. 3, 2017) (hereinafter "January 2017 Application") at 3 (Ex. 1), but under this regulation is nevertheless categorized by the agency as DME.

24.    HHS has acknowledged Congress' public consultation mandate, explaining that "[s]ection 531(b) of BIPA mandated that we establish procedures that permit public consultation for coding and payment determinations for new durable medical equipment."  80 Fed. Reg. 10,691, 10,691 (Feb. 27, 2015).

25.    On November 23, 2001, HHS established procedures to implement section 531(b) of BIPA.  HHS, *Establishment of Procedures that Permit Public Consultation Under the Existing Process for Making Coding and Payment Determinations for . . . New Durable Medical Equipment*, 66 Fed. Reg. 58,743 (Nov. 23, 2001).  Among these procedures was an open process to apply for coding changes for new DME and clinical laboratory tests.  *See id.* at 58,744.  The agency explained that the HCPCS Workgroup would review requests, "make CMS's preliminary recommendation on what action needs to be taken in response to the request," and "[o]nce the Workgroup's preliminary recommendation has been developed, the request will be added to the agenda for the next available public meeting."  *Id.*  The public meeting was intended to "allow interested parties the opportunity to make oral presentations and submit written comments regarding coding and pricing recommendations for new DME that have been submitted using the HCPCS coding modification process."  *Id.*  CMS explained that after the public meeting, "the workgroup will reconsider its preliminary coding recommendations," and "decide what recommendations it should make."  *Id.*

26.     New HCPCS Level II billing codes may be requested by application.  2015 Coding Guidelines at 6.  The HCPCS Workgroup reviews and makes determinations on applications for new HCPCS Level II billing codes.  *Id.* at 7.  A decision on whether to grant a unique billing code for an item is separate from a decision as to whether any health care plan or federal health care program will cover the item and, in the event of coverage, in what amount. *Id.* at 2 ("HCPCS is a system for identifying items and certain services.  It is not a methodology or system for making coverage or payment determinations, and the existence of a code does not, of itself, determine coverage or non-coverage for an item or service.  While these codes are used for billing purposes, decisions regarding the addition, deletion, or revision of HCPCS codes are made independent of the process for making determinations regarding coverage and payment.").

27.     The HCPCS Workgroup is comprised of representatives from CMS, other federal agencies, state Medicaid agencies, the private insurance sector, and the Department of Veteran's Affairs.  *Id.* at 7.

28.     On information and belief, the HCPCS Workgroup includes a representative of the Blue Cross and Blue Shield Association as one of its members from the private insurance sector.

29.     HHS did not complete a federal advisory committee charter with respect to the HCPCS Workgroup.

30.     Ordinarily, the HCPCS Workgroup meets monthly.  2015 Coding Guidelines at 7.

31.     Those monthly HCPCS Workgroup meetings are not "open to the public" as required by 5 U.S.C. app. 2 § 10(a).  Likewise, on information and belief, the documents and meeting records of the HCPCS Workgroup are not available for public inspection.

32.     In 2006, the HCPCS Workgroup issued a HCPCS "Decision Tree" that describes the substantive criteria that the HCPCS Workgroup uses in deciding external requests to add or revise codes.  HCPCS Decision Tree (Oct. 16, 2006),

https://www.cms.gov/Medicare/Coding/MedHCPCSGenInfo/Downloads/HCPCS_Decision_Tree_and_Definitions.pdf (last visited Feb. 1, 2018) (hereinafter "HCPCS Decision Tree").

33.     The HCPCS Decision Tree was not issued through notice-and-comment rulemaking.

34.     The HCPCS Decision Tree provides, *inter alia*, that a new code should be created for a product or item if it is primarily medical in nature, FDA-cleared, there is a national program operating need among insurers for it, it performs a significantly different function than other HCPCS Level II-categorized items, operates differently, has a significant therapeutic distinction compared to existing coded treatments or products, and meets specified volume and marketing criteria.  *See id.*  The Decision Tree provides a list of "Definitions and Clarifications" for the terms it uses.  *Id.*

35.     In 2015, the HCPCS Workgroup issued the 2015 Coding Guidelines.

36.     The 2015 Coding Guidelines provide, *inter alia*, that

> [w]hen there is not a distinct code that describes a product, a code may be requested (1) if the FDA allows the product to be marketed in the United States and (2) if the product is not a drug, the product has been on the market for at least 3 months; if the product is a drug, there is no requirement to submit marketing data; and (3) the product represents 3 percent or more of the outpatient use for that type of product in the national market.

2015 Coding Guidelines at 6.

37.     The 2015 Coding Guidelines also further addresses when an existing code "describes the product":

When an existing code adequately describes the item in a coding request, then no new or modified code is established.  An existing code adequately describes an item in a coding request when the existing code describes products with the following:

- Functions similar to the item in the coding request.

- No significant therapeutic distinctions from the item in the coding request.

*Id.* at 8.

38.    The 2015 Coding Guidelines were not issued through notice-and-comment rulemaking procedures.

39.    Beyond the 2015 Coding Guidelines and the HCPCS Decision Tree, the Healthcare Common Procedure Coding System (HCPCS) Level II Code Modification Request Process 2019 Update, *rev'd* April 2017 https://www.cms.gov/Medicare/Coding/MedHCPCSGenInfo/Downloads/HCPCS-Application.pdf (last visited Feb. 1, 2018) ("Application Questionnaire"), also contains additional and different instructions and criteria for evaluation of requests to add or modify codes.  *Compare* Application Questionnaire *with* 2015 Coding Guidelines *and* HCPCS Decision Tree.  The application asks for information regarding product durability, which is not referenced in the 2015 Coding Guidelines or the HCPCS Decision Tree.  *Compare* Application Questionnaire at 6 *with* 2015 Coding Guidelines *and* HCPCS Decision Tree.  The application also requires an applicant to indicate the suggested retail price of the item, whereas the 2015 Coding Guidelines specifically note that price is not a consideration of the HCPCS Workgroup in evaluating applications.  *Compare* Application Questionnaire at 8 *with* 2015 Coding Guidelines at 8.  Notably, even where similar information is requested in the Application Questionnaire and other documents, the request is made inversely, which creates the potential for inconsistency. *Compare* Application Questionnaire at 7 (asking "Explain why existing code categories are

inadequate to describe this product.") *with* 2015 Coding Guidelines at 8 (defining "adequately describes" as when the existing code describes products with "functions similar to the item in the coding request" and has "no significant therapeutic distinctions from the item in the coding request") *and* HCPCS Decision Tree at 1 (noting that the HCPCS Workgroup determines "whether the item performs a significantly different function than items currently categorized in HCPCS").

40.    Following the HCPCS Workgroup's review of a coding request, the workgroup makes a preliminary determination regarding whether the request has merit.  *Id.* at 7.  The HCPCS Workgroup's preliminary determination is published on the CMS website as a preliminary coding decision.  *Id.* at 10; *accord* Statement of C. Hake at June 8, 2017 HCPCS Public Meeting at 10:24-30, YouTube, https://www.youtube.com/watch?v=MMIuSRtcKzw (last visited Feb. 1, 2018).

41.    Following a preliminary coding decision by the workgroup to deny a request for a new billing code, the applicant may seek reconsideration.  2015 Coding Guidelines at 8-10.

42.    CMS hosts only one annual public meeting regarding the HCPCS code changes that are "under consideration."  *Id.* at 8-9.  "The purpose of the Public Meetings is to provide a forum for the general public to present information regarding specific [HCPCS] coding requests for products, supplies and services."  2017 Guidelines for Participation in Public Meetings For All New Public Requests For Revisions to the Healthcare Common Procedure Coding System (HCPCS) at 1,

https://www.cms.gov/Medicare/Coding/MedHCPCSGenInfo/Downloads/ParticipationGuidelines.pdf (last visited Feb. 1, 2018).

43.     Notably, however, decisions are not made at the annual public meetings, and the public meetings "are not CMS HCPCS Workgroup meetings." *Id.* at 13.  Instead, the HCPCS Workgroup convenes separate, closed meetings apart from the public meetings.  *See id.*

44.     At the recent HCPCS Workgroup's June 8, 2017 Public Meeting, its Chair explained that following the HCPCS Workgroup's public meetings, the HCPCS Workgroup "reconvenes" to reconsider billing code applications.  Statement of C. Hake at June 8, 2017 HCPCS Public Meeting at 10:48.

45.     The HCPCS Workgroup is responsible for making final decisions on requests for new billing codes, as well as other adjustments to HCPCS codes.  2015 Coding Guidelines at 9; *accord* Statement of C. Hake at June 8, 2017 HCPCS Public Meeting at 10:58-11:01 (stating that "we," in reference to HCPCS Workgroup, "begin to formulate *our* final decisions" after the workgroup reconvenes following public meetings) (emphasis added).

46.     The HCPCS Workgroup's final decision becomes the final agency decision.  *See* 2015 Coding Guidelines at 9; Statement of C. Hake at June 8, 2017 HCPCS Public Meeting at 10:59.  *See also* 81 Fed. Reg. 41,036, 41,073 (June 23, 2016) ("Within CMS, the CMS HCPCS Workgroup, which is comprised of representatives of major components of CMS and consultants from pertinent Federal agencies, is responsible for all revisions, deletions, and addition to the HCPCS level II codes."); 76 Fed. Reg. 24,034, 24,034 (Apr. 29, 2011) ("All information is received and distributed to CMS' HCPCS workgroup and is reviewed and discussed at workgroup meetings.  In turn, CMS' HCPCS workgroup reaches a decision as to whether a change should be made to codes in the HCPCS code set.").

47.     Thus, the HCPCS Workgroup's role is not limited to solely advisory functions, contrary to 5 U.S.C. app. 2 § 9(b), which requires that federal advisory committees be "utilized

solely for advisory functions," as well as the purpose of the workgroup, which as described by the agency when the workgroup was set up was to make recommendations, *see* 66 Fed. Reg. at 58,744.  Further, CMS has improperly shifted decision-making authority to a group comprised largely of non-government officials in violation of unlawful delegation principles.

48.     Once the HCPCS Workgroup has reached a final decision on an application for a new billing code, the decision is final without any process for reconsideration or appeal.  An unsuccessful applicant's only recourse is to apply for a code again the following year, when the agency accepts requests in its next annual coding application cycle.  2015 Coding Guidelines at 10 ("A requestor who is dissatisfied with the final decision may submit a new request in a subsequent coding cycle.").

49.     In addition to the annual cycle during which the HCPCS Workgroup reviews external applications for new Level II codes, the HCPCS code set can be updated multiple times per year through the HCPCS Quarterly Updates.  *See* HCPCS Quarterly Update, https://www.cms.gov/Medicare/Coding/HCPCSReleaseCodeSets/HCPCS-Quarterly-Update.html (last visited Feb. 1, 2018).  The HCPCS Quarterly Update process is used to establish Temporary Codes.  2015 Coding Guidelines at 10.  Decisions regarding Temporary codes are made by the HCPCS Workgroup.  *Id*. at 5.  The Coding Guidelines describe this process as existing for the purpose of issuing additional codes outside of the scheduled annual process.  *Id*.

50.     In addition to the lack of an administrative appeals process, multiple problems permeate the process for assigning new HCPCS Level II codes, as a large number of healthcare providers, suppliers and manufacturers have raised with the agency.  *See* Letter of Aug. 15, 2017 from Alliance for HCPCS II Coding Reform to Secretary and CMS Administrator,

https://www.aahd.us/wp-content/uploads/2017/08/HCPCSCodingReformMedicare082017letterHHS.pdf (last visited Feb. 1, 2018).  These additional problems include lack of transparency in the process for deciding new code requests, lack of transparency as to the rationale for denied requests, and a pattern of refusal to issue new codes.  *See id.* at 2, 4-5.

51.     The result of these multiple deficiencies in the code assignment process is inadequate and inappropriate coding, which in turn restricts patient access to needed medical products and has a chilling effect on investment in research and innovation, particularly research and innovation benefitting small patient populations.  *See id.* at 1, 5-6.

## V.     FACTS SPECIFIC TO THIS CASE

### A.  RELiZORB and Its Approved Uses

52.     RELiZORB is a device containing a digestive enzyme designed to mimic normal pancreatic function by breaking down fats in enteral tube feeding formula.  *See* January 2017 Application at 1 (Ex. 1).  It is most commonly used by severely malnourished and underweight patients who suffer from fat malabsorption associated with cystic fibrosis and rely on enteral tube feeding for nutrition as well as weight gain and maintenance.  *Id.*

53.     Fat malabsorption is most common in individuals who cannot produce adequate amounts of digestive enzymes, typically pancreatic lipase, for meaningful fat hydrolysis (breakdown of fats) following meals or snacks because their pancreatic function is compromised.  *Id.*  Incomplete hydrolysis of fats can lead to decreased caloric intake, reduced digestion of essential fats, deficiencies of fat-soluble vitamins, and increased gastrointestinal symptoms.  *Id.*  These conditions can significantly reduce quality of life and nutritional status as well as ability to

maintain or gain weight and absorb necessary nutrients.  *Id.*; *see also* Presentation and Statement of D. Tassé at June 8, 2017 HCPCS Public Meeting at 2 (Ex. 2).

54.     Enteral feeding refers to the delivery of nourishment directly to a patient's gastrointestinal tract, colloquially known as using a "feeding tube" (though, this can also refer to other delivery mechanisms, not just through the GI tract).  *See generally* Schwarzenberg SJ, et al., *Enteral tube feeding for individuals with cystic fibrosis: Cystic Fibrosis Foundation evidence-informed guidelines*, 15 Journal of Cystic Fibrosis 724, 725 (2016), http://dx.doi.org/10.1016/j.jcf.2016.08.004 (last visited Feb. 1, 2018).  For patients suffering from fat malabsorption, the pancreas does not produce the necessary enzymes or does not secrete them in sufficient amounts to absorb fats and calories, with the result that these patients experience malnutrition and other digestive problems.  January 2017 Application at 1 (Ex. 1).

55.     Until RELiZORB was cleared for use with enteral tube feedings, patients had to ingest pancreatic enzyme replacement therapy in pill format ("PERT") at the beginning of their enteral feed, at some point during the feed, and at the conclusion of the feed to ensure some enzymes were present to break down the essential fatty acids and allow calories to be absorbed. *See id*. at 1, 4.  Since digestive enzymes found in PERT formulations last only 45-60 minutes after administered, PERT cannot provide continuous enzymatic presence during enteral feeds (which may last 6-10 hours and are therefore usually done overnight), leaving patients to suffer from symptoms of fat malabsorption.  *See id*.  As administration of PERT is required during a feeding, patients and their caregivers must wake up during the night for administration of the PERT formulation, significantly decreasing their overall quality of life.  *See id*.  Additionally, patients wake up with symptoms of fat malabsorption in the morning and are not hungry for several hours.  *Id.* at 4.  Lack of appetite leads to missed morning meals thereby jeopardizing

these patients' ability to take in adequate calories during their oral feedings throughout the day. *Id.*

56.    PERT is not indicated for use with enteral tube feedings.  *See* Label: Pertzye, *available at* https://www.accessdata.fda.gov/drugsatfda_docs/label/2016/022175s003lbl.pdf at 2 (last visited Feb. 1, 2018).  This use is thus "off label."  *See id.*  Clinical guidelines from the Cystic Fibrosis Foundation note that "[n]o data supports" the practice of crushing PERT pills into formula prior to delivery, which some cystic fibrosis centers report doing to administer PERT as part of enteral feeding.  *See* Schwarzenberg et al., at 9.  Nevertheless, until RELiZORB, PERT was the only option available to these medically fragile patients.  January 2017 Application at 4 (Ex. 1).

57.    PERT's inadequacy in terms of fat absorption is reflected in a recent study of children and adults suffering from pancreatic exocrine insufficiency who were enterally fed and given PERT for an average of over six years.  *See* Summary of Study 497 submitted with January 2017 Application (Ex. 1) (Orenstein, et al., *Safety, Tolerability, and Fat Absorption Using a Novel In-line Digestive Enzyme Cartridge (RELiZORB) in Patients with Cystic Fibrosis Receiving Enteral Nutrition*).  The mean fatty acid levels of these patients were 60 percent lower than normal values, and the patients' mean body mass index ("BMI") was significantly below target.  *Id.*; *see also* Presentation and Statement of D. Tassé at June 8, 2017 HCPCS Public Meeting at 6 (Ex. 2).

58.    RELiZORB mimics pancreatic function by exposing enteral feeding formula to the active digestive enzyme pancreatic lipase (the enzyme which breaks down fat, attached to polymeric carriers and together called iLipase) to hydrolyze the omega-3 fatty acids that have been linked to optimal brain and vision development, cognition improvement, improved

immunity and cardiac health.  January 2017 Application at 4 (Ex. 1).  No other product on the market, including PERT, functions this way, and none helps patients absorb nutrition and maintain weight gains as effectively as RELiZORB.  *Id.* at 1, 6.  RELiZORB is the only FDA-cleared digestive product for use in enteral tube feeding.  *Id.*

59.     Alcresta developed RELiZORB with financial support from the Cystic Fibrosis Foundation.  Statement of Dr. Albert Faro, CEO of the Cystic Fibrosis Foundation to CMS HCPCS Working Group, June 8, 2017[1] Public Meeting at 1 (exhibit pages unnumbered) ("Written Statement of Dr. Faro") (Ex. 3).

60.     Currently, RELiZORB is commonly used by a small subset of patients suffering from cystic fibrosis, but it can also be used by patients suffering from pancreatitis, pancreatic cancer, or other serious diseases that can similarly prevent patients from secreting sufficient amounts of pancreatic lipase necessary for proper fat absorption.  January 2017 Application at 3 (Ex. 1).

61.     On November 20, 2015, the FDA—an HHS component—cleared RELiZORB through its *de novo* classification procedure.  82 Fed. Reg. 47,969, 47,970 (Oct. 16, 2017) (codifying classification of RELiZORB as a class II device).  The *de novo* procedure is appropriate only where there is no substantially equivalent FDA-cleared device already on the market which could serve as a predicate for FDA clearance under section 510(k) of the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 310(k).  82 Fed. Reg. at 47,970 (approving RELiZORB as a class II device and establishing special controls to which, as a class II device, it is subject); *accord* FDA Order of Nov. 20, 2015 (in form of letter from FDA to Alcresta of Nov. 20, 2015), https://www.accessdata.fda.gov/cdrh_docs/pdf15/den150001.pdf (last visited Feb. 1,

---

[1] The heading of the statement, as a result of typographical error, dates it as June 8, 2018, instead of June 8, 2017.

2018) (also attached to Alcresta's 2016 Alpha-Numeric HCPCS Coding Recommendation (Dec. 2015) (Ex. 4)); FDA, *De Novo Classification Process (Evaluation of Automatic Class III Designation): Guidance for Industry and FDA Staff* (Oct. 30, 2017) at 4, https://www.fda.gov/downloads/MedicalDevices/DeviceRegulationandGuidance/GuidanceDocuments/ucm080197.pdf (last visited Feb. 1, 2018).  The FDA approved RELiZORB as a new type of device after that agency independently assessed and found that no legally marketed device of the same type exists.  *See De Novo Classification Process* at 10-11.

62.    RELiZORB was initially cleared for use in adults.  *Id.*; *see also* 82 Fed. Reg. at 47,970.  Since then, it has yielded clinical successes where traditional pill-form hydrolyzing enzymes did not adequately serve patients' needs.  January 2017 Application at 5 (Ex. 1).

63.    Subsequent to the January 2017 Application, Alcresta received FDA clearance to market RELiZORB for use in pediatric populations as well.  FDA Order of July 12, 2017 (in form of letter from FDA to Alcresta), https://www.accessdata.fda.gov/cdrh_docs/pdf16/K163057.pdf (last visited Feb. 1, 2018) (Ex. 5).  Alcresta notified the workgroup of the clearance for pediatric use, and the workgroup placed that information in Alcresta's application file.  Email from C. Hake to A. Conner (July 17, 2017) (Ex. 6).

64.    The RELiZORB device consists of a separate, single-use cartridge filled with the enzyme that is administered to a patient via a feeding tube.  January 2017 Application at 3 (Ex. 1).

65.    Though it requires a prescription to obtain, patients undergoing enteral feeding may administer RELiZORB at home without assistance from a healthcare professional.  *Id.* at 9, 10.

66.     RELiZORB has been determined to be safe and effective for fat absorption in patients who are enterally-fed and must use pancreatic enzyme replacement. *See id*. at 5.  The first human clinical trial of RELiZORB, presented at the October 2016 North American Cystic Fibrosis Conference, showed statistically significant improvement in fatty acid absorption. *See id*.  It also demonstrated decreased frequency and severity of gastrointestinal symptoms associated with fat malabsorption, and preserved appetite such that the patients were able to eat breakfast after using RELiZORB during overnight enteral tube feeding. *See id.*  The 2016 study ("Study 497") assessed RELiZORB in a multicenter, prospective, randomized, double-blind, cross-over study among 33 patients who have decreased pancreatic function and are enterally-fed due to cystic fibrosis, including many who remained underweight and malnourished despite an average of 6.6 years of off-label use of oral PERT formulations. *See id*.; Summary of Study 497 submitted with January 2017 Application (Ex. 1).  Study 497 showed positive results in terms of increased ability to absorb omega-3 fatty acids that are sources of energy as well as essential components of cell membranes and are integral in maintaining normal development and overall health. *See* January 2017 Application at 5 (Ex. 1); Summary of Study 497 submitted with January 2017 Application (Ex. 1).  The study also showed lowered frequency and severity of gastrointestinal symptoms as compared to use of PERT, and more patients had a preservation of appetite and were able to eat breakfast after using RELiZORB during overnight enteral tube feeding as compared to without RELiZORB. *See* January 2017 Application at 5, 8 (Ex. 1); *see also* Summary of Study 497 submitted with January 2017 Application.  Subsequently, Study 498—the largest prospective study to date of patients with cystic fibrosis and receiving enteral nutrition—showed a 2.2-fold increase in omega-3 tissue absorption following 90 days of use of RELiZORB, an improvement in the weight percentiles in 61% of the study participants, and

gastrointestinal symptoms commonly associated with fat malabsorption either improved or

unchanged.  Stevens et al., *Long-Term Use of RELiZORB by Children and Adults with CF*

*Receiving Enteral Feeding (EF) Increases Omega 3 Fatty Acid Levels and Improves Nutritional*

*Parameters*, 52 *Pediatric Pulmonology* (Issue Supplement S47) S1, S450 (Sept. 2017),

http://onlinelibrary.wiley.com/doi/10.1002/ppul.23840/epdf (last visited Feb. 1, 2018).

Additional RELiZORB-related studies conducted by both Alcresta and independently by large

academic centers were peer-reviewed and accepted for presentation at the 2017 conference of

National Association of Cystic Fibrosis Centers.  Among the findings of these studies were

improvements in markers for weight gain and BMI stabilization through increased fatty acid

absorption—important therapeutic effects—through use of RELiZORB, including a comparison

to off-label use of PERT.  *See generally* Iwanicki, et al., *Use of Immobilized Lipase Cartridge*

*with Overnight Enteral Feeds Improves Symptoms and Results in Weight Gain in Children with*

*Cystic Fibrosis*, 52 *Pediatric Pulmonology* at S452-53; Minor, et al., *Digestive Enzyme Cartridge*

*(RELiZORB) During Continuous Enteral Feeds Among Individuals with Cystic Fibrosis*,

52 *Pediatric Pulmonology* at S459; Hendrix, et al., *Use of an In-Line Digestive enzyme*

*Cartridge in Pediatric Patients*, 52 *Pediatric Pulmonology* at S461.

   67. Only some enterally-fed patients, specifically those who experience fat

malabsorption, use RELiZORB.  Presentation and Statement of D. Tassé at June 8, 2017 HCPCS

Public Meeting at 2 (Ex. 2).

**B. Alcresta's Initial, December 2015 Application for a Unique Billing Code**

   68. Following RELiZORB's FDA clearance in November 2015, Alcresta submitted

an application to the HCPCS Workgroup for a unique HCPCS Level II Code for RELiZORB on

December 18, 2015.  Alcresta's 2016 Alpha-Numeric HCPCS Coding Recommendation (Dec. 2015) (Ex. 4).

69.     In the spring of 2016, the HCPCS Workgroup issued its preliminary coding determination that RELiZORB was already adequately described by codes B4034, B4035, and B4036.  *See* Centers for Medicare & Medicaid Services (CMS) Healthcare Common Procedure Coding System (HCPCS) Application Summaries for DME and Accessories; O & P; Supplies and Other June 1, 2016 at 16 (document pages unnumbered), https://www.cms.gov/Medicare/Coding/MedHCPCSGenInfo/Downloads/2016-06-01-HCPCS-Application-Summary.pdf (last visited Feb. 1, 2018).  Two of those codes (B4034 and B4036, which are for supply kits for syringe feeding and for gravity feeding, respectively) were for expressly off-label uses of RELiZORB, which is only cleared for use with pump feeding.  *See* FDA Order of Nov. 20, 2015.

70.     On May 31, 2016, Alcresta requested that the workgroup reconsider its preliminary decision.  Letter from Alcresta to CMS, May 31, 2016 (Ex. 7).  On June 1, 2016, at the annual HCPCS Workgroup Public Meeting, a representative from Alcresta spoke, disagreeing with the preliminary decision to place RELiZORB into the three existing codes and emphasizing the patient benefits of a separate code.  CMS HCPCS Application Summaries for DME and Accessories; O & P; Supplies and Other June 1, 2016 at 17 (document pages unnumbered).

71.     The HCPCS Workgroup reconvened to consider Alcresta's application together with the input provided at the Public Meeting.  *Id*.  Subsequently, the workgroup revised its preliminary decision, and denied the request for approval of a new Level II HCPCS code to separately identify RELiZORB.  *Id.*; *accord* Letter from CMS to Alcresta, Nov. 3, 2016 (Ex. 8).  The reason given was that "a national program operating need was not identified by Medicare,

Medicaid, or the Private Insurance sector to establish a new code to identify the RELiZORB

Cartridge."  Letter from CMS to Alcresta, Nov. 3, 2016, at 2.  Nevertheless, B4034, B4035, and

B4036 continue to be listed on the DMEPDAC code database as applicable to RELiZORB.  *See*

DMEPDAC Product Search Results for "B4035,"  https://www.dmepdac.com/dmecsapp/ (use

"Search DMEPOS Product Classification List" link and search using the "HCPCS Code" input

box for "B4035") (last visited Feb. 1, 2018).

72.     The HCPCS Decision Tree defines "national programmatic need" as:

> At least one insurance sector, public (Medicare or Medicaid) or private (commercial
> insurers) identified a program operating need to separately identify the item and that need
> is common across the sector, (i.e., nationally, as opposed to one or a handful of individual
> insurers or states). Does not apply if item identification is statutorily required.

HCPCS Decision Tree at 2.

### C.     Alcresta's January 2017 Application for a Unique Billing Code

73.     In early January 2017, Alcresta submitted a second application to CMS for a

unique code for RELiZORB within the HCPCS Level II Code Set.  January 2017 Application

(Ex. 1).

74.     This application complied with the requirements delineated by the HCPCS

Workgroup.  *See* Application Questionnaire; *see also* 2015 Coding Guidelines; HCPCS Decision

Tree.

75.     While substantially similar, the three documents apparently governing submission

and review of code applications do not contain the same criteria.  *Compare* Application

Questionnaire *with* 2015 Coding Guidelines *and* HCPCS Decision Tree.  For example, the

HCPCS Decision Tree is the only one of the three documents that mentions national

programmatic operating need, and that criterion is not reflected in the 2015 Coding Guidelines or

in any of the questions on the Application Questionnaire.  *Compare* HCPCS Decision Tree (Tier

1 box "Is there a national program operating need for Medicare, Medicaid and/or Private

Insurers" at 1 accompanying Definitions and Clarifications) at 2 *with* Application Questionnaire

at 7 (requesting applicants to list any third party payers that pay for the product, but not

mentioning national program operating need or the HCPCS Decision Tree definition) *and* 2015

Coding Guidelines at 8 (listing the criteria used by the HCPCS Workgroup to determine whether

a new or modified code is warranted, and making no mention of national programmatic need).

76.     Alcresta submitted a timely, complete application before the January 4, 2017

deadline.  *See* January 2017 Application at 11 (Ex. 1); *see also* HCPCS Decision Tree at 1 (box

for responding to "Was the application timely and complete?").

77.     Alcresta's application explained that RELiZORB is not capital equipment, *see*

January 2017 Application at 3 (Ex. 1), not exclusively for use in an inpatient setting, *see id.* at

10, not appropriate for a different code set, *see id.* at 3, and was therefore appropriate for an

HCPCS Level II code.  *See* HCPCS Decision Tree at 1.  Accordingly, Alcresta satisfied the

Decision Tree criterion "Is HCPCS Level II the appropriate code jurisdiction?"  *See id.*

78.     The application showed that RELiZORB is primarily medical in nature and is not

useful in the absence of a medical condition.  January 2017 Application at 9 (Ex. 1).  RELiZORB

is only available from a licensed healthcare profession and requires a prescription.  *Id.* at 8.

Accordingly, Alcresta satisfied the Decision Tree criterion "Is the product/item primarily medical

in nature (used by health care providers for diagnostic or therapeutic purpose)?"  *See* HCPCS

Decision Tree at 1.

79.     The application conveyed that the FDA had cleared RELiZORB.  January 2017

Application at 9 (Ex. 1).  Accordingly, Alcresta satisfied the Decision Tree criterion "Is there

FDA approval if regulated by FDA?"  *See* HCPCS Decision Tree at 1.

80.     The application conveyed that private and public insurers that do cover use of RELiZORB (Humana and CareSource of Ohio) face challenges in payment, due to the use of a miscellaneous Level II code in the absence of a unique code for RELiZORB.  January 2017 Application at 8 (Ex. 1).  Accordingly, Alcresta satisfied the Decision Tree criterion "Is there a national program operating need for Medicare, Medicaid and/or Private Insurers."  *See* HCPCS Decision Tree at 1.  In addition, on information and belief a full third of cystic fibrosis treatment centers from around the country sent letters to the HCPCS Workgroup in support of a unique code for RELiZORB, indicating that patients nationwide rely on the singularly effective treatment afforded by RELiZORB's active enzyme technology for improvement to their overall health and quality of life.

81.     The application highlighted that private insurance providers routinely pay for PERT, which, as discussed above, has been found to be less effective than RELiZORB (¶ 66), as they contain the same active ingredient (but wholly different delivery mechanisms).  January 2017 Application at 8 (Ex. 1).

82.     By the HCPCS Decision Tree's delineated process, all of these positive responses would lead the reviewer to conclude that a Level II code is appropriate for this item.  *See* HCPCS Decision Tree.  This means that an item would be considered under the Tier 2 criteria to determine which HCPCS Level II code should be used.  *See id*.

83.     The application explained that RELiZORB performs a significantly different function than items currently categorized by HCPCS Level II codes, highlighting that RELiZORB is the only FDA-cleared digestive packed enzymatic device for use with enteral tube feeding formula administration.  *Id. at* 2.  Accordingly, Alcresta satisfied the Decision Tree criterion ". . . whether the item performs a significantly different function than item(s) currently

categorized in HCPCS." *See* HCPCS Decision Tree at 1. "Performs a different function" is defined as: "Does something completely different to the patient. Examples: suction for a different purpose; static vs. dynamic; swing vs. stance." *Id*. at 2. As the only product of its kind, RELiZORB by definition performs a different function than any product currently coded by HCPCS. January 2017 Application at 8 (Ex. 1).

84.     The application also stressed that RELiZORB operates differently from any product on the market due to its novel fat hydrolysis technology. *Id*. Accordingly, Alcresta satisfied the Decision Tree criterion "Does it operate differently?" HCPCS Decision Tree at 1. The HCPCS Decision Tree defines "operates differently" as: "Performs the same or similar function to other items, using a different mechanism. Examples: mechanical vs. electronic; automatic vs. manual regulating; extrinsic vs. intrinsic lubrication." *Id.* at 2. As the only product of its kind, even among other enteral feeding items, RELiZORB by definition operates differently from any product currently coded by HCPCS and meets this standard. *See* January 2017 Application at 7 (Ex. 1).

85.     The application also demonstrated "significant therapeutic distinction." *See id.* at 8. The HCPCS Decision Tree defines "significant therapeutic distinction" as:

> Improved medical benefit when compared with the use of other, similar items, e.g., significantly improved medical outcome or significantly superior clinical outcome. Requests for modifications to the HCPCS Level II code set based on such claims are reviewed on a case-by-case basis, taking into consideration clinical information provided by the applicant and other commentators that supports or refutes the claim(s) made by the applicant. In submitting a request, an applicant should provide the best available information supporting his or her claim. Greater weight will be given to more methodologically rigorous and scientifically reliable evidence. Note that process indicators (such as improved compliance, convenience and personal preference) are considered significant distinctions only to the extent that they result in demonstrably improved clinical outcomes.

HCPCS Decision Tree at 2.

86.     RELiZORB's unique features provide therapeutic benefit.  January 2017

Application at 7.  RELiZORB contains the active lipase enzyme (in the form of iLipase) that

breaks down fats in enteral formula immediately *before* the formula enters the body, so that it

enters in an absorbable state with essential fatty acids easier to absorb and gastrointestinal

symptoms related to fat malabsorption less frequent and severe than with use of off-label oral

PERT formulations.  *Id.* at 7-8.  This is in contrast to inert enteral feeding supplies, such as

tubing, which have no therapeutic function at all.  *Id.* at 7.  The application also highlights that,

while PERT also contains a fat hydrolyzing compound, PERT is intended and indicated for use

with oral meals and has no guidelines for off-label usage in enteral feeding.  *Id.*  Nor are there

any published studies to date on the safety or efficacy of PERT with enteral nutrition.  *Id.* at 7.

87.     Alcresta thus satisfied the Decision Tree criterion "Is there a significant

therapeutic distinction compared to existing coded treatments or products?"  *See* HCPCS

Decision Tree at 1.  The application highlights that without a unique code, suppliers were using a

miscellaneous code—B9998 "NOC [not otherwise classified] enteral supplies"—to be

reimbursed for RELiZORB treatments.  January 2017 Application at 7 (Ex. 1).  As its description

suggests, this miscellaneous code is used to bill for supplies, *see* HCPCS B-Codes: Enteral and

Parenteral Therapy, https://hcpcs.codes/b-codes/ (last visited Feb. 1, 2018), which as Alcresta

pointed out, are inert materials like tubing, pumps, and formula bags, January 2017 Application

at 7.

88.     The application also showed that RELiZORB meets the volume and market

criteria necessary for a unique code.  January 2017 Application at 10 (Ex. 1).  Accordingly,

Alcresta satisfied the Decision Tree criterion "Does it meet volume and marketing criteria?"

HCPCS Decision Tree at 1.  The HCPCS Decision Tree defines the required volume and

marketing in relevant part as "There must be sufficient claims activity or volume (3% of affected population)."  *Id.* at 2.  There were 29,497 people with cystic fibrosis in the United States in 2016.  Cystic Fibrosis Foundation, 2016 Patient Registry: Annual Data Report at 4, https://www.cff.org/Research/Researcher-Resources/Patient-Registry/2016-Patient-Registry-Annual-Data-Report.pdf (last visited Feb. 1, 2018).  Approximately 12% of those patients are enterally fed.  Summary of Study 497 submitted with January 2017 Application at 1 (Ex. 1).  At the time of the application, RELiZORB was used by 25% of the adult cystic fibrosis patient population who receive enteral nutrition.  January 2017 Application at 10 (Ex. 1).

**D.  2017 Preliminary Decision and Reconsideration Process**

89.     Despite the showings made in Alcresta's application, the HCPCS Workgroup's preliminary determination on the application summarily concluded that existing codes B4034, B4035, and B4036 adequately described RELiZORB, stating that "this device [RELiZORB] is already included in one of the following existing kit codes, depending on route of administration."  CMS HCPCS Application Summaries for DME and Accessories; O & P; Supplies and Other June 8, 2017 at 16 https://www.cms.gov/Medicare/Coding/MedHCPCSGenInfo/Downloads/2017-06-08-HCPCS-Application-Summary.pdf (last visited Feb. 1, 2018).

90.     Code B4034 encompasses "Enteral feeding supply kit; syringe fed, per day, includes but not limited to feeding/flushing syringe, administration set tubing, dressings, tape."  HCPCS B-Codes: Enteral and Parenteral Therapy.  Code B4035 encompasses "Enteral feeding supply kit; pump fed, per day, includes but not limited to feeding/flushing syringe, administration set tubing, dressings, tape."  *Id.*  Code B4036 encompasses "Enteral feeding supply kit; gravity fed, per day, includes but not limited to feeding/flushing syringe, administration set tubing,

dressings, tape." *Id.*  Because codes B4034 and B4036 refer to enteral feeding using a syringe or

gravity feeding, assignment of those codes to RELiZORB would appear to encourage the off-

label use of RELiZORB, which is cleared by the FDA only for use in pump-fed enteral feeding.

*See* FDA Order of Nov. 20, 2015 at 3 (attached as part of Ex. 4).

      91.     On June 8, 2017, the HCPCS Workgroup conducted a Public Meeting on its

preliminary coding decisions during the 2017 application round.  CMS HCPCS Application

Summaries for DME and Accessories; O & P; Supplies and Other June 8, 2017 at 1.

      92.     Alcresta made an oral presentation explaining why a unique code for RELiZORB

would result in greater patient access and reduced administrative burdens.  *Id*. at 27.  It

additionally explained that a unique code for RELiZORB would enhance the efficiency of the

coding system, as RELiZORB is not used by every patient who uses enteral feeding systems.

Presentation and Statement of D. Tassé at June 8, 2017 HCPCS Public Meeting at 8 (Ex. 2).  By

contrast, bundling RELiZORB together with enteral feeding systems would be wasteful and

confusing to providers and patients.  CMS HCPCS Application Summaries for DME and

Accessories; O & P; Supplies and Other June 8, 2017 Summary, pages 26-27; *accord*

Presentation and Statement of D. Tassé at June 8, 2017 HCPCS Public Meeting at 10 (Ex. 2).

Alcresta also brought to the attention of the HCPCS Workgroup that prescriptions for

RELiZORB had more than doubled since the January 3, 2017 application was submitted, and

that 93% of these prescriptions were for cystic fibrosis patients, demonstrating patient need as

well as strengthening the evidence in the application regarding volume and marketing criteria.

*Id*. at 7.

      93.     A representative from the Cystic Fibrosis Foundation also spoke at the June 8,

2017 meeting in support of RELiZORB's application, highlighting the strong patient outcomes

and improvements to quality of life for cystic fibrosis sufferers due to use of RELiZORB.

Written Statement of Dr. Faro at 2 (exhibit pages unnumbered) (Ex. 3).  The Foundation's

representative further stressed the difficulty in patient access to RELiZORB due to lack of a code

that properly identifies the item.  *Id.*

94.     Throughout the summer and fall of 2017, representatives of the pharmaceutical

industry, healthcare providers, members of Congress, medical product manufacturers, and patient

advocacy groups contacted CMS to express similar support for a unique code for RELiZORB.

Letters to CMS from: Asembia (Ex. 9); Cystic Fibrosis Center at Children's Hospital of the

Kings Daughters, Norfolk, VA (Ex. 10); Pediatric Pulmonary and Cystic Fibrosis Center of

Oklahoma at the University of Oklahoma Health Science Center June 9, 2017 (Ex. 11);

Intermountain Cystic Fibrosis Center at Primary Children's Hospital, Salt Lake City, UT

(undated) (Ex. 12); Antonio J. and Janet Palumbo Cystic Fibrosis Center, Children's Hospital of

Pittsburgh of UPMC (Ex. 13); Congressional Cystic Fibrosis Caucus (Ex. 14); Option Care (Ex.

15); American Society for Parenteral and Enteral Nutrition ("ASPEN") (Ex. 16).

95.     Children's hospitals in four different states described the improvements in their

cystic fibrosis patients as a result of RELiZORB.  Letters to CMS from: Cystic Fibrosis Center at

Children's Hospital of the Kings Daughters, Norfolk, VA, June 2, 2017 (Ex. 10); Pediatric

Pulmonary and Cystic Fibrosis Center of Oklahoma at the University of Oklahoma Health

Science Center, June 9, 2017 (Ex. 11); Intermountain Cystic Fibrosis Center at Primary

Children's Hospital, Salt Lake City, UT (undated) (Ex. 12); Antonio J. and Janet Palumbo Cystic

Fibrosis Center, Children's Hospital of Pittsburgh of UPMC (undated) (Ex. 13).

96.     Three of these health care providers specifically noted that, despite their appeals

to insurers supported by letters of necessity and data indicating the positive impact of

RELiZORB, almost none of the claims for use of the device were approved for reimbursement, and patients were forced to pay out-of-pocket or forego the treatment provided by RELiZORB. Letters to CMS from: Cystic Fibrosis Center at Children's Hospital of the Kings Daughters, Norfolk, VA, June 2, 2017 (Ex. 10); Intermountain Cystic Fibrosis Center at Primary Children's Hospital, Salt Lake City, UT (undated) (Ex. 12); Antonio J. and Janet Palumbo Cystic Fibrosis Center, Children's Hospital of Pittsburgh of UPMC (undated) (Ex. 13). In light of the problems with reimbursement for RELiZORB that these healthcare providers experienced, they urged the HCPCS Workgroup to approve Alcresta's request for a unique billing code for RELiZORB. Letters to CMS from: Cystic Fibrosis Center at Children's Hospital of the Kings Daughters, Norfolk, VA, June 2, 2017 (Ex. 10); Intermountain Cystic Fibrosis Center at Primary Children's Hospital, Salt Lake City, UT (undated) (Ex. 12); Antonio J. and Janet Palumbo Cystic Fibrosis Center, Children's Hospital of Pittsburgh of UPMC (undated) (Ex. 13).

97. Pharmaceutical companies and the supplier of RELiZORB stressed the wastefulness of lumping RELiZORB together with other enteral feeding supplies, as RELiZORB is only indicated for some enterally fed patients. Letter to CMS from Asembia Aug. 23, 2017 (Ex. 9); Letter to CMS from Option Care June 6, 2017 (Ex. 15). They pointed out that this wastefulness significantly increases costs for all enteral services for all patients. Letter to CMS from Asembia Aug. 23, 2017 (Ex. 9); Letter to CMS from Option Care June 6, 2017 (Ex. 15). They further highlighted that other elements of the kits with which RELiZORB is bundled under the existing single code are provided by a different supplier. Letter to CMS from Asembia Aug. 23, 2017 (Ex. 9); Letter to CMS from Option Care June 6, 2017 (Ex. 15).

98. Use of a single code to describe the enteral tube feeding supply kit itself as well as component items of the kit—which are usually manufactured and supplied by different

companies from the other component parts—creates the possibility that several entities bill for the same product when one kit is used in patient feeding. Letter to CMS from Asembia Aug. 23, 2017 (Ex. 9); Letter to CMS from Option Care June 6, 2017 (Ex. 15). This can create confusion at the reimbursement stage and lead to denials of coverage and lack of patient access, as described below (¶¶ 104-106). *Id.*

99. Alcresta also met with representatives of the HCPCS Workgroup and CMS to discuss the application in August 2017. *See* Letter from D. Tassé to L. Wilson Aug. 31, 2017 (Ex.17). In a follow-up letter, Alcresta answered questions raised during the meeting regarding comparison of RELiZORB to the tubing kits covered by codes B4034, B4035 and B4036, and the impact of the lack of a unique code for RELiZORB for the Medicare/Medicaid population as well as for commercial insurers. *Id.* Alcresta explained that RELiZORB differs from the tubing kit items in that it provides a therapeutic benefit to the relatively small subset of enterally fed patients who suffer from fat malabsorption, and described how the absence of a unique code operates as an access barrier for Medicare and Medicaid patients as well as commercially insured patients. *Id.*

100. Additionally, Alcresta responded to questions from the HCPCS Workgroup about the information for patients that is included in RELiZORB packages and about patient use of the device. Emails between A. Conner and C. Hake (Sept. 5, 2017) (Ex. 18). In describing the patient information included in RELiZORB packages, Alcresta explained that RELiZORB is shipped to patients separately from enteral feeding supplies and highlighted the distinct shipment as support for assignment of a separate code. *Id.*

101. As reflected in the information provided to the HCPCS Workgroup by Alcresta and the additional commenters who support a separate code for RELiZORB, the other products

covered by Code B4035 are nothing like RELiZORB and instead cover mostly non-prescription generic items like bag or tube sets, dressing, clamps, flushing equipment and syringes.  *See* DMEPDAC Product Search Results for "B4035."

102.    RELiZORB provides therapeutic benefits unlike the other items covered by Code B4035, which are inert materials and/or do not contain active ingredients that mimic bodily functions which are normal in healthy individuals like the digestive enzymes contained in RELiZORB.  *See generally id.* at 5, 17 (including products described as "bulb irrigation syringe" or "power adapter").

103.    As a result of the bundling of RELiZORB with other enteral feeding supplies, insurers can view a claim for RELiZORB as a double billing.  Presentation and Statement of D. Tassé at June 8, 2017 HCPCS Public Meeting at 9 (Ex. 2); *accord* Letter to CMS from Option Care, June 6, 2017 (Ex. 15); *see also* Letter to CMS From Asembia Aug. 23, 2017 (Ex. 9). Enterally fed patients may get services from one supplier and RELiZORB from a different supplier.  Letter to CMS from Option Care, June 6, 2017 (Ex. 15); *see also* Letter to CMS from Asembia, Aug. 23, 2017 (Ex. 9).  Consequently, RELiZORB claims are frequently denied, as two suppliers cannot be reimbursed using the same code for the same patient on the same date of service, even if one is billing only for the RELiZORB.  Letter to CMS from Option Care, June 6, 2017 (Ex. 15); *see also* Letter to CMS from Asembia, Aug. 23, 2017 (Ex. 9).

104.    Denials of coverage for RELiZORB by insurers have the effect of further restricting patient access and increasing other out-of-pocket healthcare costs.  Presentation and Statement of D. Tassé at June 8, 2017 HCPCS Public Meeting (Ex. 2); Letter to CMS From Asembia Aug. 23, 2017 (Ex. 9); Letter to CMS from Option Care June 6, 2017 (Ex. 15).

105.    Patients are left with the tough choice of whether to pay for RELiZORB out of pocket or go without the treatment it provides, absent efforts by the manufacturer Alcresta to provide the item at low or no cost.  Presentation and Statement of D. Tassé at June 8, 2017 HCPCS Public Meeting (Ex. 2).

106.    A letter from the Congressional Cystic Fibrosis Caucus pointed out that CMS has previously issued unique codes for different enteral formulations that break down carbohydrates and protein.  Letter to CMS from Congressional Cystic Fibrosis Caucus, July 14, 2017, at 1 (Ex. 14).  Those previously issued unique codes describe the item and its use and impact with a degree of precision, separating the item from its delivery system, even where enteral feeding is used.  *See* HCPCS B-Codes: Enteral and Parenteral Therapy, Codes B4102-B4162.  Code B4104, for instance, is described as "Additive for enteral formula (e.g. fiber)."  *See id.*  There are fifteen separate coding categories (B4104-B4162) for different types of enteral formula that contain slightly different ingredients.  *Id.*  Many of the items reimbursable under these codes appear to be over-the-counter dietary supplements, rather than one-of-a-kind devices that have undergone the same kind of rigorous medical testing and requirements as RELiZORB.  Presentation and Statement of D. Tassé at June 8, 2017 HCPCS Public Meeting at 5-6 (Ex. 2) (describing the studies conducted on RELiZORB).  "NutriSource Fiber," covered by B4104, is an example.  *See* Medicare Part B Nestle HealthCare Nutrition Products, https://www.nestlehealthscience.us/asset-library/documents/reimbursement/medicare%20part%20b%20nestle%20healthcare%20nutrition%20products.pdf (last visited Feb. 1, 2018).  NutriSource Fiber is available for purchase through Amazon.com.  *See* NutriSource Fiber Dietary Fiber Nutritional Supplements, Unflavored, 7.2 Ounce, https://www.amazon.com/NutriSource-Dietary-Nutritional-Supplements-

Unflavored/dp/B00CJB9JO6/ref=lp_3022109011_1_2_a_it?srs=3022109011&ie=UTF8&qid=15
12431758&sr=8-2 (last visited Feb. 1, 2018).

107.    The agency, also based on HCPCS Workgroup assessments, has even assigned

separate codes for different enteral feeding pumps based on slightly different features, such as

whether an enteral feeding pump has an alarm or not.  *See* 79 Fed. Reg. 40,208, 40,287 (July 11,

2014).

**E.  2017 Final Decision**

108.    On November 6, 2017, Alcresta received a letter from CMS reflecting its final

determination to adopt the decision of the HCPCS Workgroup, stating that the request for a new

code to identify RELiZORB had been denied, and that the workgroup had determined that an

existing code adequately described RELiZORB.  Letter from CMS to Alcresta, Nov. 6, 2017, at 2

(Ex. 19).  The letter's only explanation was that "[t]he RELiZORB cartridge is included in the

enteral nutrition supply allowance for tube-feedings, at existing code B4035 'Enteral feeding

supply kit; pump fed, per day, includes but not limited to feeding/flushing syringe, administration

set tubing, dressings, tape.'"  *Id.*  The letter further stated that code B4035 describes RELiZORB

"when used with an enteral feeding using a pump, as a general rule."  *Id.*  It did not address how

RELiZORB was classified as similar to a series of inert supplies without therapeutic value, how

the use of the B4035 code addresses concerns regarding patient access, or administrative burden

and waste.  *Id.*  The DMEPDAC code database still lists B4034, B4035, and B4036 as applicable

to RELiZORB, indicating that the database has not been updated, at least with respect to

RELiZORB, since the denial.  *See* DMEPDAC Product Search Results for "B4035" at 18.[2]

---

[2] On January 2, 2018, Alcresta submitted an application for a unique billing code for RELiZORB
as part of the 2018 annual coding cycle.

109.     The denial of a separate code for RELiZORB limits patient access and increases out-of-pocket costs for those patients who depend on the treatment.  *See supra*, ¶¶ 92-99, 104-105.

110.     Alcresta has experienced financial losses as a result of the difficulties obtaining the proper initial code.  Specifically, it has been working with healthcare providers to provide a limited supply of the product to patients at low or no cost, pending assignment of a unique code that would facilitate patient access by expanding insurance coverage.  Through Alcresta's RELiZORB Bridge to Reimbursement Program, insured patients are eligible to receive RELiZORB free while they await results of a submitted prior authorization or predetermination, provided they actively pursue reimbursement approval through their insurance plan(s).  In seeking to do the right thing by supporting the small, highly vulnerable population of patients who suffer from pancreatic insufficiency, Alcresta has put patients over profits.  Without a unique code, though, it will not be able to continue to provide the product beyond January 2018.

111.     The agency's and its HCPCS Workgroup's refusal to assign a unique code for RELiZORB operates to chill the incentive of companies like Alcresta to invest in and develop products that help small populations of patients who suffer from rare conditions.

## VI.     ASSIGNMENT OF ERRORS

112.     The Administrative Procedure Act ("APA") provides for a reviewing court to "set aside" the agency's final decision denying Alcresta's application for a new billing code for RELiZORB if, *inter alia*, it is arbitrary, capricious, unsupported by substantial evidence in the record, contrary to law, or without observance of procedure required by law.  5 U.S.C. § 706(2).

113.     Under the APA, the denial should be set aside for reasons including those described below.

## COUNT I - ARBITRARY AND CAPRICIOUS DECISION-MAKING

114.     Alcresta incorporates paragraphs 1 through 113.

115.     RELiZORB satisfies all of the criteria for a new HCPCS Level II code that are set

forth in the multiple, even if at times conflicting, forms of guidance that the agency and its

HCPCS Workgroup have adopted.

116.     As explained in detail in Alcresta's application for a unique billing code and

above (¶¶ 73-88), RELiZORB meets the criteria for a new code that are set forth in the HCPCS

Decision Tree.  It provides the therapeutic benefit of hydrolyzing fats for the sickest and most

vulnerable patients suffering from severe fat malabsorption associated with conditions including,

but not limited to, cystic fibrosis, pancreatitis, pancreatic cancer, and other serious diseases.  It is

cleared by the FDA.  There is a national program operating need among insurers for RELiZORB

to be separately identified so that it is not double-billed, which is a problem given that the other

items in the enteral feeding supply kit—wholly distinct in nature—are provided by suppliers

other than the supplier of RELiZORB.  No other product on the market performs the function

that RELiZORB performs; RELiZORB is the only FDA-cleared digestive product for use with

enteral tube feeding formula administration.  And RELiZORB meets the requisite volume and

marketing criteria.

117.     As also explained in detail in Alcresta's application for a unique billing code and

above (¶¶ 73-88), RELiZORB meets the criteria for a new code that are set forth in the 2015

Coding Guidelines.  RELiZORB provides a therapeutic benefit.  It is FDA-cleared.  And it meets

the requisite volume and marketing criteria.

118.     And as explained in detail in Alcresta's application for a unique billing code and

above (¶¶ 73-88), RELiZORB also satisfies HCPCS Workgroup's criteria for a new billing code

that are reflected in the Application Questionnaire.  RELiZORB is FDA-cleared, provides the
therapeutic benefit of hydrolyzing fat for patients suffering from fat malabsorption related to
cystic fibrosis or other diseases, is not adequately described by any existing code, including
B4035, is not similar to any product on the market, is fundamentally distinct from the other items
covered by B4035, was at the time of the application paid for by two private insurers, and has
been marketed in the United States since November 2015.

119.    The agency's denial letter fails to address these facts, which Alcresta and other
stakeholders emphasized in multiple presentations to the workgroup, as described above (¶¶ 73-
88, 92-100).  Indeed, the agency failed to consider these facts or apply the substantive HCPCS
criteria.  Rather, HHS simply accepted the HCPCS Workgroup's decision as its own, apparently
without any independent consideration.

120.    Notably, HHS concluded that RELiZORB is a new type of device after it
independently assessed and concluded that no legally marketed device of the same type exists.
*Supra* ¶ 61.  On that basis, the agency approved RELiZORB through its *de novo* procedure.
With regard to billing codes, in contrast, the agency failed to account for that conclusion.  Nor
did it explain how it could approve a finding by its workgroup that billing codes created for other
products were appropriate for RELiZORB where it had concluded that RELiZORB had no
legally marketed equivalent.  These failures by HHS underscore the arbitrary and capricious
nature of the denial of Alcresta's application for a unique code.

121.    The arbitrary and capricious nature of the agency's final decision on Alcresta's
application is further underscored by the initial assignment of three billing codes to RELiZORB,
two of which were for off-label use, and its subsequent refusal to take into account the additional

evidence following a clinical study—Study 497 (described in ¶¶ 57, 66, *supra*)—that Alcresta submitted in support of its second application for a unique billing code.

122.    Despite RELiZORB's satisfaction of each criterion in each of the different forms of the HCPCS Workgroup's new billing code criteria, the agency denied Alcresta's application for a new code based on the workgroup's decision.

123.    The agency's final decision is arbitrary and capricious because it fails to consider important aspects of the problem, is contrary to the evidence that was before it, and is inconsistent with the agency's clearance of RELiZORB through the *de novo* process.  *See, e.g.*, *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (an agency's action is arbitrary and capricious if it "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."); *Defs. of Wildlife & Ctr. for Biological Diversity v. Jewell*, 815 F.3d 1, 9 (D.C. Cir. 2016) (same); *Transactive Corp. v. United States*, 91 F.3d 232, 237 (D.C. Cir. 1996) ("A long line of precedent has established that an agency action is arbitrary when the agency offered insufficient reasons for treating similar situations differently.") (citing cases).

124.    In addition, the agency's denial letter adopting its workgroup's final decision provides no rationale for its conclusion that an existing billing code is sufficient to describe RELiZORB.  The denial amounts to a bald conclusion that on its face does not reflect reasoned decision-making.  *See, e.g.*, *Motor Vehicle Mfrs. Ass'n of U.S., Inc.*, 463 U.S. at 43 (an agency decision that fails to "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made" is arbitrary and capricious) (internal quotation marks omitted); *Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343,

1350 (D.C. Cir. 2014) ("[A] fundamental requirement of administrative law is that an agency set forth its reasons for decision; an agency's failure to do so constitutes arbitrary and capricious agency action." "[C]onclusory statements will not do; an agency's statement must be one of reasoning.") (quotations and citation omitted).

125.     Furthermore, the HCPCS Workgroup's criteria for use of an existing code, instead of issuance of a new code, plainly do not apply to RELiZORB.  No product on the market functions similarly to RELiZORB.  To the contrary, RELiZORB performs a significantly different function than other products.

126.     The agency's refusal to issue a new code thus violates the published guidance on coding decisions, even if those documents do not set forth substantive rules and standards (which they do), and for that additional reason is arbitrary and capricious.  *See, e.g.*, *INS v. Yueh-Shaio Yang*, 519 U.S. 26, 32 (1996) (if an agency "announces and follows—by rule or by settled course of adjudication—a general policy by which its exercise of discretion will be governed, an irrational departure from that policy (as opposed to an avowed alteration of it) could constitute action that must be overturned as 'arbitrary, capricious, [or] an abuse of discretion' within the meaning of the Administrative Procedure Act.") (quoting 5 U.S.C. § 706(2)(A)) (alteration in original); *WMI Liquidating Tr. v. Fed. Deposit Ins. Corp.*, 110 F. Supp. 3d 44, 53 (D.D.C. 2015) ("An agency may be said to have acted arbitrarily or capriciously when it disregards its established policy without adequate explanation.").

127.     For these reasons, the agency's denial of Alcresta's application for a unique medical billing code for RELiZORB is arbitrary and capricious and should be set aside.

## COUNT II – DECISION UNSUPPORTED BY SUBSTANTIAL EVIDENCE

128.     Alcresta incorporates paragraphs 1 through 127.

129.     The HCPCS Workgroup's conclusion that RELiZORB is described by an existing code is unsupported by the evidence that was before it.

130.     The 2015 Coding Guidelines provide that existing code B4035 does not adequately describe RELiZORB.  The evidence before the HCPCS Workgroup demonstrates that the items otherwise encompassed by Billing Code B4035 do not function similarly to RELiZORB, and that there are significant therapeutic distinctions between the items encompassed by Billing Code B4035 and RELiZORB.  Yet, the workgroup concluded that the existing code B4035 is sufficient for RELiZORB.

131.     The HCPCS Workgroup disregarded the evidence before it, and the agency's denial letter identifies no evidence to support a conclusion that an existing billing code adequately describes the RELiZORB device.

132.     Therefore, the agency's code denial is not supported by substantial evidence in the record and should be set aside pursuant to 5 U.S.C. § 706(2).  *See, e.g.*, *Dickinson v. Zurko*, 527 U.S. 150, 164 (1999) (a reviewing court must determine whether an agency action that is "bound up with a record-based factual conclusion" "is supported by substantial evidence.") (quotations omitted).

## COUNT III – DECISION ISSUED WITHOUT OBSERVANCE OF REQUIRED PROCEDURE

133.     Alcresta incorporates paragraphs 1 through 132.

134.     In deciding Alcresta's billing code application, the HCPCS Workgroup applied substantive criteria set forth in the HCPCS Decision Tree, 2015 Coding Guidelines, and Application Questionnaire.

135.     As set forth above, the criteria in the HCPCS Decision Tree, 2015 Coding Guidelines, and Application Questionnaire "affect[] individual rights and obligations" and

therefore constitute substantive rules.  *See, e.g.*, *Chrysler Corp. v. Brown*, 441 U.S. 281, 302

(1979) (quoting *Morton v. Ruiz*, 415 U.S. 199, 232 (1974)).

136.    The agency did not follow the notice and comment rulemaking procedures

required by 5 U.S.C. § 553 in issuing either the HCPCS Decision Tree, the 2015 Coding

Guidelines, or the Application.

137.    To the extent that the HCPCS Workgroup's substantive legal standards set forth in

guidance documents impact Medicare reimbursement as part of the entire health industry

affected by the standard codes, the workgroup was required to follow the notice-and-comment

procedures under section 1395hh(a)(2) of the Medicare statute, 42 U.S.C. § 1395hh(a)(2).  *See*

*Allina Health Servs. v. Price*, 863 F.3d 937, 943-44 (D.C. Cir. 2017).

138.    To the extent that the HCPCS Workgroup's criteria for issuance of new billing

codes constitute manual instructions, interpretative rules, statements of policy, or guidelines of

general applicability for purposes of Medicare, the workgroup unlawfully failed to publish the

criteria in the Federal Register as required by section 1395hh(c)(1) of the Medicare statute, 42

U.S.C. § 1395hh(c)(1).  *See Chippewa Dialysis Servs. v. Leavitt*, 511 F.3d 172, 176 (D.C. Cir.

2007).

139.    The agency's final decision therefore issued without observance of procedure

required by law and should be set aside pursuant to 5 U.S.C. § 706(2)(A).

### COUNT IV – VIOLATION OF FACA AND UNLAWFUL DELEGATION PRINCIPLES

140.    Alcresta incorporates paragraphs 1 through 139.

141.    The agency's final decision is contrary to law as it was issued in violation of

FACA and unlawful delegation principles.

142. Congress enacted FACA in 1972 to allow the public to monitor "advisory committees," which "have been established to advise officers and agencies in the executive branch of the Federal Government." 5 U.S.C. app. § 2(a).

143. Through FACA, Congress meant to combat secrecy by ensuring that "the public [is] informed with respect to the number, purpose, membership, activities, and cost of advisory committees." *Id*. § 2(b)(5).

144. A "principal purpose" of FACA "was to enhance the public accountability of advisory committees established by the Executive Branch." *Pub. Citizen v. U.S. Dep't of Justice*, 491 U.S. 440, 459 (1989). Indeed, FACA arose out of the concern that interested private parties were making decisions without public input. H.R. Rep. No. 92–1017 (1972) ("One of the great dangers in this unregulated use of advisory committees is that special interest groups may use their membership on such bodies to promote their private concerns."); *see also Ass'n of Am. Physicians & Surgeons, Inc. v. Clinton*, 997 F.2d 898, 921-22 (D.C. Cir. 1993) (Buckley, J., concurring) ("Because committees not composed exclusively of federal officers and employees have members who are not required to foreswear their private associations and insulate themselves against potential conflicts of interest, FACA requires, as an alternative check, that their deliberations be conducted in the open.").

145. FACA defines "advisory committee" as "any committee, board, commission, council, conference, panel, task force, or other similar group, or any subcommittee or other subgroup thereof . . . which is (A) established by statute or reorganization plan, (B) established or utilized by the President, or (C) established or utilized by one or more agencies." 5 U.S.C. app. 2 § 3(2).

146.    Consistent with its principal purpose, FACA provides that "[e]ach advisory committee meeting shall be open to the public." *Id*. § 10(a).

147.    Additionally, consistent with Congress' purpose of controlling private parties' influence over agency decision-making, FACA requires that "[u]nless otherwise specifically provided by statute or Presidential directive, advisory committees shall be utilized solely for advisory functions." *Id*. § 9(b).  And FACA further requires that "[d]eterminations of action to be taken and policy to be expressed with respect to matters upon which an advisory committee reports or makes recommendations shall be made solely by the President or an officer of the Federal Government." *Id*.

148.    FACA also requires that "[s]ubject to section 552 of title 5, United States Code, the records, reports, transcripts, minutes, appendixes, working papers, drafts, studies, agenda, or other documents which were made available to or prepared for or by each advisory committee shall be available for public inspection and copying at a single location in the offices of the advisory committee or the agency to which the advisory committee reports until the advisory committee ceases to exist." *Id.* § 10(b).

149.    In addition to FACA, unlawful delegation principles prohibit advisory committees from making final decisions. *Shook v. D.C. Fin. Responsibility & Mgmt. Assistance Auth.*, 132 F.3d 775, 783-84 (D.C. Cir. 1998) (disapproving the D.C. Control Board's delegation of governance powers over D.C. schools to a private Board of Trustees).  When Congress has specifically vested an agency with the authority to administer a statute, the agency may not shift that responsibility to a private actor.  *Nat'l Park & Conservation Ass'n v. Stanton*, 54 F. Supp. 2d 7, 18 (D.D.C. 1999) (concluding that agency's delegation of statutory management duties violated the unlawful delegation doctrine).

150.    HHS's violations of FACA have caused injury to Alcresta.  Alcresta's request for a new code has been improperly denied.  By failing to conduct open meetings and make advisory committee materials publicly available in the manner required by FACA, HHS has obstructed Alcresta's statutory rights to obtain information concerning HHS's decision-making regarding the denial of a new code and to present information to HHS regarding any reason the agency might have for the denial.

151.    In addition, on information and belief, the workgroup's final decision to deny Alcresta a new code is tainted by the same concerns that caused Congress to enact FACA in the first place—that interested private parties were making decisions without providing the public access to the decision-making process.

152.    While a federal agency may turn to an outside entity for advice and policy recommendations, the agency must make the final decisions itself.  *Shook*, 132 F.3d at 784.  And an agency may not merely "rubber-stamp" decisions made by others under the guise of seeking their "advice."  *Assiniboine & Sioux Tribes of Fort Peck Indian Reservation v. Bd. of Oil & Gas Conservation of State of Montana*, 792 F.2d 782, 795 (9th Cir. 1986).  Nor will vague or inadequate assertions of final reviewing authority save an unlawful subdelegation.  *See Stanton*, 54 F. Supp. 2d at 19, 20-21.

153.    The HCPCS Workgroup constitutes an advisory committee as FACA defines the term, *see* 5 U.S.C. app. § 3(2).  As set forth above, the workgroup was established by CMS, includes private members and other members who are not employees of the Federal Government, and it considers and makes decisions on applications for new Medicare billing codes and other revisions to the HCPCS Level II code system.  *See supra* ¶¶ 25-28.  The workgroup convenes as

a formal group, and meets regularly for the specific purpose of considering coding issues and

making coding decisions as a group.  *See supra* ¶¶ 30-31.

154.    Thus, although CMS did not complete a federal advisory committee charter with

respect to the HCPCS Workgroup, *see* 41 C.F.R. § 102-3.75, the HCPCS Workgroup is

functioning as a *de facto* advisory committee and is therefore subject to FACA's requirements.

*See Freedom Watch, Inc. v. Obama*, 807 F. Supp. 2d 28, 34 (D.D.C. 2011).

155.    While it purports to only make recommendations, 66 Fed. Reg. at 58,744, the

HCPCS Workgroup's role is not limited to advice and recommendations.  The HCPCS

Workgroup makes preliminary and final decisions on billing code applications that are then

simply issued by the agency.  As reflected in the agency's and the HCPCS Workgroup's

characterizations of the workgroup's function and the finality of its decisions, it is clear that the

agency merely rubber-stamps the workgroup's decisions, and exercises no meaningful review of

them.  *See supra* ¶¶ 40-49.

156.    The HCPCS Workgroup thus issues final decisions, including the final decision at

issue in this action, on behalf of HHS and CMS in violation of 5 U.S.C. app. 2 § 9(b), Congress'

animated purpose in enacting FACA, and other unlawful delegation principles.

157.    On information and belief, the HCPCS Workgroup's monthly meetings are not

open to the public in violation of 5 U.S.C. app. 2 § 10(a).

158.    On information and belief, the documents and meeting records of the HCPCS

Workgroup are not available in the manner specified by 5 U.S.C. app. 2 § 10(b) and in violation

of that provision of FACA.

159.    HHS's decision therefore is contrary to law.  The decision should be held

unlawful and set aside pursuant to 5 U.S.C. § 706(2)(A).

## RELIEF REQUESTED

For the foregoing reasons, Alcresta requests an Order:

a)  declaring invalid and setting aside the November 6, 2017 final decision denying Alcresta's application for a unique billing code;

b)  declaring that HHS has violated FACA and unlawfully delegated its decision-making authority to the HCPCS Workgroup;

c)  enjoining HHS from using, or relying upon, the HCPCS Workgroup's coding decisions with respect to RELiZORB;

d)  directing HHS to consider Alcresta's application for a unique code for RELiZORB independent of the agency workgroup's decision and consistent with the factual record before the agency, valid applicable criteria for assessing coding applications, and the opinion of this court;

e)  enjoining HHS from continuing to engage in a pattern and practice of violating FACA and unlawful delegation principles;

f)  directing HHS to pay Alcresta's legal fees and other costs of suit; and

g)  providing such other relief as the Court may deem appropriate.

Respectfully submitted,

/s/ Stephanie A. Webster

_____

Stephanie A. Webster
  D.C. Bar No. 479524
Caroline L. Wolverton
  D.C. Bar No. 496433
John F. Burns
  D.C. Bar No. 1018027
AKIN GUMP STRAUSS HAUER & FELD LLP
1333 New Hampshire Avenue, N.W.
Washington, D.C.  20036

Phone: (202) 887-4040
Fax: (202) 887-4288
swebster@akingump.com

Dated: February 2, 2018