**EXHIBIT 1:**
**Proposed Amicus Curiae Brief**


**Unopposed Motion of the**
**Advanced Medical Technology Association**
**for Leave to File Amicus Curiae Brief in Support of Plaintiffs,**
*Alcresta Therapeutics, Inc. v. Azar*,
**Civil Action No. 18-243 (TJK)**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

ALCRESTA THERAPEUTICS, INC., *et al.*,

           Plaintiffs,

      v.

ALEX M. AZAR II, Secretary of Health
and Human Services,

           Defendant.

Civil Action No. 18-243 (TJK)

**BRIEF OF AMICUS CURIAE ADVANCED MEDICAL
<u>TECHNOLOGY ASSOCIATION IN SUPPORT OF PLAINTIFFS</u>**

James F. Segroves (DC Bar No. 480630)
REED SMITH LLP
1301 K Street, NW
Suite 1000 - East Tower
Washington, DC 20005-3373
202.414.9200 (phone)
202.414.9299 (fax)
jsegroves@reedsmith.com

*Counsel for Amicus Curiae
Advanced Medical Technology Association*

## CORPORATE DISCLOSURE STATEMENT

In accordance with Local Civil Rule 7(o)(5) (incorporating Fed. R. App. P. 29(a)(4)), the undersigned certifies that the Advanced Medical Technology Association (AdvaMed) has no corporate parent and, since AdvaMed is a non-profit, tax-exempt organization, no publicly held corporation has a 10-percent or greater ownership interest in AdvaMed.

_/s/ James F. Segroves_
James F. Segroves

**TABLE OF CONTENTS**

Page

CORPORATE DISCLOSURE STATEMENT ................................................................. i

TABLE OF AUTHORITIES ............................................................................................ iii

GLOSSARY ..................................................................................................................... vi

INTEREST OF AMICUS CURIAE ................................................................................. 1

ARGUMENT .................................................................................................................... 2

       CMS'S PROCESS FOR ESTABLISHING LEVEL II HCPCS CODES IS
       UNLAWFUL AND REQUIRES SIGNIFICANT REFORMATION ............................... 2

       A.     CMS's Establishment and Use of the Workgroup Violates FACA No
            Matter How Long the Workgroup Has Been in Existence ..................................... 2

       B.     The HCPCS Level II Coding Process Lacks Transparency and Leads to
            Decisionmaking That Is Arbitrary and Capricious ................................................. 8

CONCLUSION.................................................................................................................. 12

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Accrediting Council for Indep. Colls. & Sch. v. DeVos*,
303 F. Supp. 3d 77 (D.D.C. 2018) ................................................................................. 8

*Alameda Cnty. Med. Ctr. v. Leavitt*,
559 F. Supp. 2d 1 (D.D.C. 2008) .................................................................................. 5

*Am. Hosp. Ass'n v. Azar*,
No. 1:14-cv-00851, 2018 WL 5723141 (D.D.C. Nov. 1, 2018) ................................... 7

\*    *Animal Legal Def. Fund, Inc. v. Shalala*,
104 F.3d 424 (D.C. Cir. 1997) ..................................................................................... 5

*ANR Storage Co. v. FERC*,
904 F.3d 1020 (D.C. Cir. 2018) ................................................................................... 8

*Caring Hearts Personal Home Servs., Inc. v. Burwell*,
824 F.3d 968 (10th Cir. 2016) ..................................................................................... 5

*Children's Hosp. Ass'n of Tex. v. Azar*,
300 F. Supp. 3d 190 (D.D.C. 2018) .............................................................................. 8

*Ctr. for Biological Diversity v. Tidwell*,
239 F. Supp. 3d 213 (D.D.C. 2017) .............................................................................. 3

*EEOC v. Nat'l Children's Ctr., Inc.*,
98 F.3d 1406 (D.C. Cir. 1996) ..................................................................................... 8

*H. Lee Moffitt Cancer Ctr. & Research Inst. Hosp., Inc. v. Azar*,
324 F. Supp. 3d 1 (D.D.C. 2018) .................................................................................. 8

*McCready v. Nicholson*,
465 F.3d 1 (D.C. Cir. 2006) ......................................................................................... 8

\*    *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) ..................................................................................................... 10

*Perez v. Mortg. Bankers Ass'n*,
135 S. Ct. 1199 (2015) ............................................................................................... 11

*Pub. Citizen v. U.S. Dep't of Justice*,
491 U.S. 440 (1989) ..................................................................................................... 3

---

\*    Authorities upon which we chiefly rely are marked with asterisks.

*Ryskamp v. Comm'r*,
  797 F.3d 1142 (D.C. Cir. 2015)...................................................................................... 10

*Se. Ala. Med. Ctr. v. Sebelius*,
  572 F.3d 912 (D.C. Cir. 2009)........................................................................................ 5

## STATUTES

5 U.S.C. § 706(2)(A)....................................................................................................... 8

5 U.S.C. § 706(2)(D)....................................................................................................... 3

42 U.S.C. § 1395ff........................................................................................................... 7

Federal Advisory Committee Act,
  Pub. L. No. 92-463, 86 Stat. 770 (1972) (codified as amended at 5 U.S.C. app. 2)............... 2, 3

  § 2(a) ........................................................................................................................ 3

  § 2(b) ........................................................................................................................ 3

  § 2(b)(6) .................................................................................................................... 3

  § 3(2) ........................................................................................................................ 3

  § 5(b)(2) ................................................................................................................. 4, 7

  § 5(c) ........................................................................................................................ 4

  § 9(c) ........................................................................................................................ 3

  § 10(a) ...................................................................................................................... 4

  § 10(c) ...................................................................................................................... 3

  § 10(e) ...................................................................................................................... 4

## OTHER AUTHORITIES

Ctrs. for Medicare & Medicaid Servs., *Changes to the Healthcare Common Procedure Coding System (HCPCS) Coding Process for 2019* (Nov. 29, 2018)..................... 11

Fed. R. App. P. 29(a)(4)............................................................................................................. 1

Local Civ. R. 7(o)(5).................................................................................................................. 1

Medicare Program; Establishment of Procedures That Permit Public Consultation Under the Existing Process for Making Coding and Payment Determinations for New Clinical Laboratory Tests and for New Durable Medical Equipment, 66 Fed. Reg. 58,743 (Nov. 23, 2001) ...................................................................... 5

Medicare Program; Request for Nominations for Members for the Medicare Evidence Development & Coverage Advisory Committee, 82 Fed. Reg. 51,257 (Nov. 3, 2017)............. 7

Office of the General Counsel, General Accounting Office, *Advisory Committee Act: Violation by Health Care Financing Administration*, File No. B-278940 (1998)..................... 6

**GLOSSARY**

APA          Administrative Procedure Act

CMS          Centers for Medicare & Medicaid Services

FACA          Federal Advisory Committee Act

HCPCS          Healthcare Common Procedure Coding System

## INTEREST OF AMICUS CURIAE

The Advanced Medical Technology Association (AdvaMed) is the world's largest medical technology association, with over 400 member companies that develop medical devices, diagnostic tools, and health-information systems. AdvaMed's members span every field of medical science and range from cutting-edge startups to multinational manufacturers, all dedicated to advancing clinician and patient access to safe, effective medical technologies in accordance with the highest ethical standards. The innovations created by AdvaMed's members advance efficiency in health care through earlier disease detection and more effective treatments, which, in turn, reduce the economic burden of disease and allow people to live longer, healthier, and more productive lives.[*]

AdvaMed and its members have a substantial interest in the process used by the Centers for Medicare & Medicaid Services (CMS) for establishing Level II codes under the Healthcare Common Procedure Coding System (HCPCS). Despite its seemingly ministerial appearance, CMS's Level II HCPCS coding process serves a de facto gatekeeping function regarding whether new medical products—already approved for use by the Food and Drug Administration—will be paid for by federal health care programs such as Medicare, state-federal health care programs such as Medicaid, and private health insurance. Consequently, CMS's Level II HCPCS coding process serves a de facto gatekeeping function regarding the ability of patients throughout the United States to have meaningful access to new medical products that are deemed medically necessary by patients' treating clinicians.

---

[*] In accordance with Local Civil Rule 7(o)(5) (incorporating Fed. R. App. P. 29(a)(4)), the undersigned certifies that no counsel for a party authored this brief in whole or in part, no party or counsel for a party made a monetary contribution intended to fund the preparation or submission of this brief, and no person or entity other than AdvaMed made a monetary contribution to its preparation or submission.

Importantly, CMS's process for establishing Level II HCPCS codes relies on a formal Workgroup that historically has been comprised of employees of federal agencies including CMS, state Medicaid employees, and individuals employed by private insurance companies—the very types of individuals who, no matter how well intentioned, serve at the behest of organizations whose respective bottom lines may suffer if a request to establish a Level II code for a new medical product is granted. Until recently, the Workgroup's exact composition and the manner in which it operated were shrouded in secrecy. This litigation led by Plaintiff Alcresta Therapeutics, Inc. (Alcresta) has served the salutary function of helping lift that veil of secrecy. In doing so, Alcresta has laid bare significant legal deficiencies that require reformation of CMS's Level II HCPCS coding process.

## **ARGUMENT**

### **CMS'S PROCESS FOR ESTABLISHING LEVEL II HCPCS CODES IS UN-LAWFUL AND REQUIRES SIGNIFICANT REFORMATION**

Most rational business actors do not seek to sue the largest single purchaser of their products: in the case of medical products in the United States, the Federal Government. Alcresta has been forced to do just that in this litigation challenging the process used by CMS for establishing HCPCS Level II codes. Alcresta's legal claims, including its claim regarding whether CMS's establishment and use of the Workgroup violates the Federal Advisory Committee Act (FACA), Pub. L. No. 92-463, 86 Stat. 770 (1972) (codified as amended at 5 U.S.C. app. 2), have substantial merit and warrant judicial action requiring CMS to reform its Level II HCPCS coding process.

**A.    CMS's Establishment and Use of the Workgroup Violates FACA No Matter How Long the Workgroup Has Been in Existence**

In relevant part, the Administrative Procedure Act (APA) provides that a reviewing court shall hold unlawful and set aside agency action found to be "without observance of procedure

required by law." 5 U.S.C. § 706(2)(D). FACA is one such law. *See, e.g.*, *Ctr. for Biological Diversity v. Tidwell*, 239 F. Supp. 3d 213, 220–21 (D.D.C. 2017) (finding that although FACA does not confer a private right of action, FACA violations may be rectified under the APA).

"FACA was born of a desire to assess the need for the 'numerous committees, boards, commissions, councils, and similar groups which have been established to advise officers and agencies in the executive branch of the Federal Government.'" *Pub. Citizen v. U.S. Dep't of Justice*, 491 U.S. 440, 445–46 (1989) (quoting FACA § 2(a)). FACA's purpose, the Supreme Court has explained, was to

> ensure that new advisory committees be established only when essential and that their number be minimized; that they be terminated when they have outlived their usefulness; that their creation, operation, and duration be subject to uniform standards and procedures; that Congress and the public remain apprised of their existence, activities, and cost; and that their work be exclusively advisory in nature.

*Id.* at 446 (citing FACA § 2(b)). This last purpose bears emphasizing in the context of this case. In relevant part, FACA expressly provides that the "function of advisory committees should be advisory only, and . . . all matters under their consideration should be determined, in accordance with law, by the official, agency, or officer involved." FACA § 2(b)(6).

FACA defines the term "advisory committee" as "any committee, board, commission, council, conference, panel, task force, or other similar group, or any subcommittee or other subgroup thereof," that is "established or utilized by one or more agencies . . . in the interest of obtaining advice or recommendations for . . . one or more agencies or officers of the Federal Government . . . ." FACA § 3(2). The term does not include "any committee that is composed wholly of full-time, or permanent part-time, officers or employees of the Federal Government . . . ." *Id.* The statute requires that each advisory committee file a charter, *id.* § 9(c), and keep detailed minutes of its meetings, *id.* § 10(c). Such meetings must be chaired or attended by an

officer or employee of the Federal Government who is authorized to adjourn any meeting when he or she deems its adjournment in the public interest. *Id.* § 10(e). FACA also requires advisory committees to provide advance notice of their meetings and to open them to the public. *Id.* § 10(a). In addition, an advisory committee's membership must be "fairly balanced in terms of the points of view represented . . . ." *Id.* § 5(b)(2), (c).

CMS has formally conceded that it "established" the Workgroup, Answer to Am. Compl. ¶ 165, ECF No. 38; that the Workgroup has not been chartered in compliance with FACA, *id.* ¶ 166; that the Workgroup "convenes as a formal group regularly," *id.* ¶ 165; that the Workgroup "includes contractors and members of state governments," *id.*; and that the Workgroup's monthly meetings are not open to the public, *id.* ¶ 169. Therefore, it is hard to imagine on what basis CMS can be substantially justified in continuing to deny that FACA applied to its creation and operation of the Workgroup. Alcresta thoroughly addresses arguments challenging the applicability of FACA that were made by CMS in opposing Alcresta's Motion for a Preliminary Injunction prior to the filing of the Answer to the Amended Complaint, which arguments have since been factually disproven by the discovery permitted by the Court over CMS's objection. *See* Pls.' Mem. of P. & A. in Supp. of Mot. for Summ. J. at 37–38, ECF No. 87 (describing, among other things, deposition testimony and documentation establishing that the Workgroup operates on a consensus basis). Rather than repeat those arguments, however, AdvaMed wishes to emphasize that CMS's use of the Workgroup for many years does not insulate it from judicial review.

The Workgroup has been in operation for approximately 20 years without any apparent legal challenge under FACA. *See, e.g.*, Medicare Program; Establishment of Procedures That Permit Public Consultation Under the Existing Process for Making Coding and Payment Determinations for New Clinical Laboratory Tests and for New Durable Medical Equipment, 66 Fed.

Reg. 58,743, 58,744 (Nov. 23, 2001) (describing certain Workgroup functions). On first blush, this would appear to support the notion that the Workgroup's creation and operation do not run afoul of any statute. After all, history demonstrates that CMS is no stranger to litigation brought in this Court and elsewhere. *See, e.g.*, *Alameda Cnty. Med. Ctr. v. Leavitt*, 559 F. Supp. 2d 1, 1–2 (D.D.C. 2008) ("In this case, the Court is asked to decide whether a maneuver by [CMS] deliberately designed to outfox a clear directive of Congress [imposing a moratorium on the finalization of a proposed rule] was successful. The answer is no."); *Caring Hearts Personal Home Servs., Inc. v. Burwell*, 824 F.3d 968, 976 (10th Cir. 2016) (Gorsuch, J.) ("This case has taken us to a strange world where [CMS] itself—the very 'expert' agency responsible for promulgating the 'law' no less—seems unable to keep pace with its own frenetic lawmaking. A world Madison worried about long ago, a world in which the laws are 'so voluminous they cannot be read' and constitutional norms of due process, fair notice, and even the separation of powers seem very much at stake.").

Importantly, however, the law of this Circuit instructs that the mere passage of time cannot answer the question of whether the Workgroup is, in fact, subject to FACA. *See Animal Legal Def. Fund, Inc. v. Shalala*, 104 F.3d 424, 425–26, 431 (D.C. Cir. 1997) (finding that advisory body, which for over 40 years had published a multi-edition guide for handling and monitoring the treatment of laboratory animals, was subject to FACA); *see also Se. Ala. Med. Ctr. v. Sebelius*, 572 F.3d 912, 920 (D.C. Cir. 2009) (rejecting CMS defense of Medicare reimbursement practice based on the fact that the practice was in effect for over 20 years without challenge, explaining: "[T]hat is history, not explanation.").

Nor would this be the first time that a CMS-established body, which had escaped legal challenge for many years, would ultimately be found to violate FACA. In 1998, for example, the

predecessor to what is now the Government Accountability Office (GAO) concluded that the predecessor to what is now CMS had established and operated an illegal advisory committee for 15 years. *See* Office of the General Counsel, General Accounting Office, *Advisory Committee Act: Violation by Health Care Financing Administration*, File No. B-278940 (1998), *available at* https://www.gao.gov/decisions/archive/278940.pdf (last visited Dec. 6, 2018). The advisory body in question—the Technology Advisory Committee—originated in a group established in 1983 and advised the agency on whether Medicare should cover new medical technologies on a nationwide basis. *Id.* at 1. Much like the HCPCS Workgroup, the membership of the Technology Advisory Committee included not only CMS employees and employees of other federal agencies, but employees of private insurance companies under contract to help administer the Medicare program. *Id.* at 5. In concluding that the Technology Advisory Committee violated FACA, GAO specifically rejected the assertion that such private employees could be considered federal officers or employees so as to exempt the committee from the strictures of FACA. *See id.* at 7 n.8 ("We understand that it has been suggested that the Committee might fall within [FACA's] third exception on the theory that the [insurance] carrier employees should be regarded as federal employees based on the unique and close relationship between the carriers and the federal government. However, this theory is untenable: carrier employees do not meet the legal requirements for status as officers or employees of the United States.").

CMS responded appropriately to GAO's inquiry by acknowledging that the Technology Advisory Committee violated FACA, *see id.* at 2, and by voluntarily replacing the committee with a FACA-chartered body now known as the Medicare Evidence Development & Coverage Advisory Committee, *see* Medicare Program; Request for Nominations for Members for the Medicare Evidence Development & Coverage Advisory Committee, 82 Fed. Reg. 51,257,

- 6 -

51,257 (Nov. 3, 2017) (describing committee's creation in 1998, the same year as GAO's inquiry). CMS should follow this precedent and voluntarily do the right thing here as it relates to the HCPCS Workgroup, which would include ensuring that the Workgroup's membership is "fairly balanced in terms of the points of view represented . . . ." FACA § 5(b)(2). For example, to AdvaMed's knowledge, the Workgroup has always been heavily dominated by public and private payor interests and has suffered from a failure to include adequate representation of persons advocating the needs of patients, clinicians seeking to provide their patients with the best treatments possible, and medical technology innovators.

Moreover, CMS's establishment and use of the Workgroup has escaped judicial review until now for a reason. Obtaining a new HCPCS Level II code is just one step in a multistep gauntlet that a new medical product must undergo before it is fully embraced by public payors such as Medicare. Common to much of that process is the fact that CMS and/or its contractors significantly influence the ultimate outcome. *See* 42 U.S.C. § 1395ff (describing multistep process by which adverse medical-necessity and other initial determinations must be challenged); *see also Am. Hosp. Ass'n v. Azar*, No. 1:14-cv-00851, 2018 WL 5723141, at *3 (D.D.C. Nov. 1, 2018) (granting mandamus relief to address the fact that appeals under the foregoing process "languish for years").

There are inherent risks associated with pursuing litigation against CMS. In light of that practical reality, one can hardly blame the manufacturer of a new medical product for not suing CMS in order to challenge the denial of a particular HCPCS Level II code application or the HCPCS Level II coding process more generally. Not only does such litigation require a significant investment of time and resources, succeeding in such litigation could ultimately prove counterproductive if the plaintiff wins the coding battle with respect to one new medical product

- 7 -

but ultimately loses the coverage battle for that product—and potentially numerous other medical products—after antagonizing CMS and its contractors.

**B.     The HCPCS Level II Coding Process Lacks Transparency and Leads to Decisionmaking That Is Arbitrary and Capricious**

It is often said that judicial review of agency action is deferential, particularly when that review is conducted under the APA's arbitrary-and-capricious standard, 5 U.S.C. § 706(2)(A). Of particular note here, when a party seeks review of agency action under the APA, this Court "sits as an appellate tribunal." *H. Lee Moffitt Cancer Ctr. & Research Inst. Hosp., Inc. v. Azar*, 324 F. Supp. 3d 1, 9–10 (D.D.C. 2018) (Kelly, J.) (internal quotation marks and citation omitted). Although summary judgment is the appropriate procedure when a party seeks review of agency action under the APA, *Accrediting Council for Indep. Colls. & Sch. v. DeVos,* 303 F. Supp. 3d 77, 94 (D.D.C. 2018), "the normal standards for summary judgment set forth in Federal Rule of Civil Procedure 56 do not apply" to most APA challenges, *Children's Hosp. Ass'n of Tex. v. Azar*, 300 F. Supp. 3d 190, 204 (D.D.C. 2018). Instead, when addressing whether agency action is arbitrary and capricious under the APA, the Court must "focus on the reasons stated in the orders under review. . . . [T]he agency decision itself must be reasonable *and* reasonably explained." *ANR Storage Co. v. FERC*, 904 F.3d 1020, 1024 (D.C. Cir. 2018) (emphasis added) (internal quotation marks and citations omitted).

This analytical construct is similar to that applied by an appellate court when it reviews a district court's decision under an abuse-of-discretion standard of review. As the D.C. Circuit has explained in that analogous context: "When 'we review a district court's decision . . . for an abuse of discretion, it is imperative that a district court articulate its reasons.'" *McCready v. Nicholson*, 465 F.3d 1, 15 (D.C. Cir. 2006) (quoting *EEOC v. Nat'l Children's Ctr., Inc.*, 98 F.3d 1406, 1410 (D.C. Cir. 1996)) (ellipses supplied by *McCready*).

- 8 -

And therein lies one of the primary criticisms leveled against CMS's HCPCS Level II coding process: namely, that the final decisions issued on CMS letterhead fail to adequately explain the basis for why the application was denied. This, in turn, causes manufacturers to expend significant resources reapplying for a code the following year, with little guidance regarding the basis for rejection of the prior year's submission.

For example, with respect to Alcresta's 2016 application for a Level II code for the product at issue here, the preliminary decision stated that a new code was denied because the product in question "is already included" in one of three preexisting codes. Ex. 8 to Am. Compl., ECF No. 7-8. After Alcresta challenged that preliminary determination and pressed its case at the Workgroup's annual public meeting, Alcresta was eventually told that "[t]he CMS HCPCS Workgroup reconvened to reconsider your application" and that "CMS revised its decision." *Id.* at 2. The revised decision asserted that Alcresta's application was denied because a "national program operating need was not identified by Medicare, Medicaid, or the Private Insurance sector to establish a new code to identify [Alcresta's product]." *Id.* Not a single piece of evidence presented by Alcresta was addressed in the revised decision. Additionally, CMS did not indicate why a program need did not exist or explain its change in position regarding the device being described by a preexisting code.

Like many manufacturers seeking a HCPCS Level II code, Alcresta reapplied the following year and received a preliminary decision once again stating that the same three existing codes "adequately describe[d] the [new] product." Ex. 19 to Am. Compl., ECF No. 7-19. When Alcresta challenged that preliminary determination and once again presented its case at the annual public meeting of the Workgroup, Alcresta was ultimately told that "[t]he CMS HCPCS Workgroup reconvened to reconsider this application" and that "CMS ha[d] revised its decision."

*Id.* at 2. Instead of relying on an amorphous "national program operating need" standard without elaboration as it had the year before, however, the revised decision on the 2017 application declared without elaboration that Alcresta's product "is included" in one of the three preexisting codes—a reversion to the preliminary ruling on Alcresta's 2016 application. *Id.* Once again, not a single piece of evidence presented by Alcresta was addressed in the revised decision.

CMS is thwarting meaningful judicial review by providing ambiguous rulings that compromise applicants' ability to refine their submissions in a way that could result in a favorable outcome. Among other things, the APA requires that an agency "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotation marks and citation omitted). "In reviewing that explanation, [a court] must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Id.* (internal quotation marks and citations omitted). "Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.*

Decisions denying applications for HCPCS Level II codes typically make no effort to examine the relevant data and fail to articulate a satisfactory explanation for why the applications were denied. Such decisions do little more than state conclusions. The APA requires more of final agency action. *See, e.g.*, *Ryskamp v. Comm'r*, 797 F.3d 1142, 1151 (D.C. Cir. 2015) (finding agency's boilerplate letter was insufficient in explaining basis for decision).

CMS appears to have acknowledged that systemic problem, at least on a going-forward basis. On the evening of the day on which Alcresta filed its Motion for Summary Judgment, CMS posted on its HCPCS website a list of changes to the HCPCS Level II coding process for 2019. *See* Ctrs. for Medicare & Medicaid Servs., *Changes to the Healthcare Common Procedure Coding System (HCPCS) Coding Process for 2019* (Nov. 29, 2018), *available at* https://www.cms.gov/Medicare/Coding/MedHCPCSGenInfo/Downloads/2019-11-29-Summary-of-Reforms-Announcement.pdf (last visited Dec. 6, 2018). Among the changes that CMS announced was that CMS would provide "more detailed responses to applications in order to provide greater transparency and to assist the public in understanding CMS' decision making." *Id.* While AdvaMed welcomes that and other changes announced by CMS, the longevity and effectiveness of the changes is threatened because of the informal nature of the announcement and CMS's potential ability to rescind the changes at any time, without prior notice, using similar informal means. *See Perez v. Mortg. Bankers Ass'n*, 135 S. Ct. 1199, 1206 (2015). CMS's recently announced changes cannot salvage the revised determinations at issue here.

[*Remainder of Page Intentionally Blank*]

- 11 -

**CONCLUSION**

For the foregoing reasons and those advanced by Alcresta, the Court should grant

Alcresta summary judgment.

Dated: December 6, 2018                          Respectfully submitted,

                                                 REED SMITH LLP


                                        By:   /s/ James F. Segroves
                                              James F. Segroves (DC Bar No. 480630)
                                              1301 K Street, NW
                                              Suite 1000 - East Tower
                                              Washington, DC 20005-3373
                                              202.414.9200 (phone)
                                              202.414.9299 (fax)
                                              jsegroves@reedsmith.com

                                              *Counsel for Amicus Curiae*
                                              *Advanced Medical Technology Association*